2006-NMSC-035

140 P.3d 515

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Nathaniel DURAN, Defendant–Appellant.**

**No. 28,685.**

Supreme Court of New Mexico.

July 20, 2006.

John Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

CHÁVEZ, Justice.

{1} Defendant Nathaniel Duran ("Defendant") was convicted of first-degree murder, criminal sexual penetration while armed with a deadly weapon, and tampering with evidence. The trial court sentenced Defendant to life in prison for murder in the first-degree, nine years for criminal sexual penetration, and 18 months for tampering with evidence, with each sentence to run consecutively. Defendant appeals his convictions for first-degree murder, see Rule 12–102(A)(1) NMRA 2006 (appeals from sentence of life imprisonment taken to the Supreme Court), and tampering with evidence, asserting on appeal that insufficient evidence exists to support the verdicts. Defendant also asserts that the State committed fundamental error when the prosecutor forced Defendant to comment on the credibility of other witnesses. We affirm Defendant's conviction for first-degree murder, reverse the conviction for tampering with evidence, and hold that, while the questioning by the prosecutor was clearly improper, there was no fundamental error.

## I. FACTS AND BACKGROUND

{2} Police were called to investigate the presence of a body on the floor of an apartment at St. Francis Plaza in Ranchos de Taos. The victim was a thirty-six year old woman who had recently moved into the

apartment, which was owned by the grandfather of the seventeen year-old Defendant. Although they found no evidence of forced entry, there was blood all over the floor and walls. Defendant became a suspect in the case based on an anonymous call received at the Taos County Sheriff's office.

{3} At trial, the State presented evidence from the medical examination of the victim's body that revealed multiple stab wounds to the head and neck, the chest and abdomen, and additional sharp force injuries to the chest, abdomen, and back. The victim also had wounds on her fingers that were consistent with defensive wounds. The medical testimony characterized the victim's death as resulting from multiple stab wounds rather than from one specific injury, and indicated the wounds were caused by a sharp object, "like a knife." The analysis of vaginal and thigh swabs taken from the victim's body revealed semen. Based on DNA tests, Defendant could not be eliminated as a possible donor of the sperm-cell DNA. Defendant testified that he had engaged in consensual sex with the victim, but denied killing her.

{4} The State also presented testimony from three friends of Defendant who testified about statements made by Defendant. Carlos Mondragon testified Defendant told him that he had hurt a lady and stabbed her eight or nine times. Mondragon's girlfriend, Shonna Romero, testified she heard Defendant say he had hurt some lady and stabbed her with a knife. Michael Romero testified Defendant told him that he "straight-up murdered some bitch." In addition, a Taos County Sheriff's Deputy testified that when Defendant was given a copy of the criminal complaint, Defendant commented "they charged me for killing two people and I only killed one."

## II. SUFFICIENCY OF THE EVIDENCE

■ {5} The test for sufficiency of the evidence "is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). In addition, "we must view the evi-

dence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000–NMSC–009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (citing *State v. Salazar*, 1997–NMSC–044, ¶¶ 44, 46, 123 N.M. 778, 945 P.2d 996). In our determination of the sufficiency of the evidence, we are required to ensure that "a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). "We apply these principles to our review of the evidence used to support Defendant's convictions for murder [and] tampering with evidence . . . ." *Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

### A. First–Degree Murder

■ {6} Defendant asserts on appeal that there was insufficient evidence of deliberate murder to support the first-degree murder conviction and that the State failed to prove deliberate intent beyond a reasonable doubt. In New Mexico, first-degree murder includes "any kind of willful, deliberate and premeditated killing." NMSA 1978, § 30–2–1(A)(1) (1994). Deliberate intention is defined as "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14–201 NMRA. In addition, we have stated that a "calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill." *Garcia*, 114 N.M. at 271, 837 P.2d at 864.

■ {7} We believe the State presented evidence from which a reasonable jury could have found beyond a reasonable doubt that Defendant had the deliberate intent necessary to sustain his conviction. " 'Intent is subjective and is almost always inferred from other facts in the case, as it is rarely estab-

lished by direct evidence.'" *State v. Sosa,* 2000–NMSC–036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (quoting *State v. Vigil,* 110 N.M. 254, 255, 794 P.2d 728, 729 (1990)). The jury was instructed that the State had to prove beyond a reasonable doubt that Defendant killed the victim with "the deliberate intention to take away the life" of the victim. The jury was also instructed as to the definition of "deliberate intention":

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intent to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{8} Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence. *See Rojo,* 1999–NMSC–001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (deliberate intent to kill established when strangulation took several minutes and defendant had motive to kill victim); *Sosa,* 2000–NMSC–036, ¶ 14, 129 N.M. 767, 14 P.3d 32 (evidence that defendant went armed to victim's home, waited for victim to arrive, shot at unarmed victim, and continued attack after victim tried to flee supported inference of deliberate intent); *State v. Coffin,* 1999–NMSC–038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (jury could infer defendant formed deliberate intent to kill victim when defendant told victim to get back in his car then shot victim several times from behind); *Cunningham,* 2000–NMSC–009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (deliberate intent inferred from defendant firing fatal shot at victim after victim was incapacitated and defenseless). Here, a reasonable jury could have believed Defendant had the deliberate intent to kill the victim by inferring from the physical evidence of a prolonged struggle and multiple

stab wounds. The State presented physical evidence based on blood spatter that the victim tried to stop the attacker from entering her bedroom, and that she tried to escape or call for help from a window. The victim was also stabbed in the back and in the jugular veins of the throat, and had several wounds consistent with her attempt to defend herself from the attacker.

{9} In addition to the physical evidence, the statements made by Defendant would also support a jury's finding that the killing was deliberate. The State presented evidence that Defendant claimed to have hurt a lady and stabbed her eight or nine times. There was also testimony that Defendant told his friend he had "straight up murdered some bitch." *Cf. State v. Smith,* 76 N.M. 477, 482, 416 P.2d 146, 150 (1966) (a jury may consider the animus of the accused toward the deceased in determining deliberate intent). Thus, based on the nature and extent of the victim's injuries, the jury could infer a prolonged struggle where the attacker pursued the victim despite her attempts to withdraw or escape. When combined with evidence of Defendant's attitude toward the victim, this evidence is sufficient to support the jury's finding that the murder of the victim was done with deliberate intent.

{10} Defendant asserts that the evidence could be construed as showing that the murder was rash and uncontrolled, and thus is similar to *Garcia,* 114 N.M. at 274–75, 837 P.2d at 867–68, where we reversed a conviction for first-degree murder because the evidence did not support a jury finding of deliberate intent. Although we found evidence in *Garcia* that the act of murder was itself intentional, we could not find any evidence from which the jury could infer that the murder was deliberate. Instead, the only evidence before the jury in *Garcia,* either direct or circumstantial, was that the defendant and the victim had quarreled, made up, then quarreled again and traded punches immediately before defendant stabbed the victim. *Id.* at 274–75, 837 P.2d at 867–68. Finding nothing in the evidence presented that could reasonably lead the jury to infer that the defendant had acted with deliberation rather than rashly and impulsively, we

reversed the defendant's conviction for first-degree murder. *Id.* at 275–76, 837 P.2d at 868–69.

{11} We conclude that *Garcia* is distinguishable. Here, there was evidence from which the jury could reasonably infer that Defendant acted with deliberate intent because the attack was part of a prolonged struggle, Defendant stabbed the victim multiple times as she tried to escape, and Defendant further revealed his intent in his later description of his actions. Thus, reviewing the physical evidence and Defendant's statements in the light most favorable to the verdict, we hold that there was sufficient evidence to support the jury's conclusion that Defendant had deliberate intent when he killed the victim to justify the verdict of first-degree murder.

**B. Tampering with Evidence**

{12} Defendant appeals his conviction for tampering with evidence under NMSA 1978, § 30–22–5 (2003), arguing there was insufficient evidence to support his conviction on this charge. We apply the same principles to our review of the evidence as described above. In order to find Defendant guilty of tampering with evidence, the State must prove beyond a reasonable doubt that:

1. The defendant destroyed or hid physical evidence to wit: a knife or sharp object and his blood stained clothing;

2. The defendant intended to prevent the apprehension, prosecution, or conviction of himself;

3. This happened in Taos County, New Mexico on or about the 7th day of July 2002.

UJI 14–2241 NMRA. We conclude that there is insufficient evidence for a rational jury to have found each of the elements necessary for a conviction of this crime beyond a reasonable doubt.

{13} The charge of tampering with evidence in this case is based upon the State's assertions that a knife or sharp object must have been used in the crime, and that clothing worn by the attacker would have become blood-stained during the attack. The police did not find a knife or sharp object or any blood-stained clothing. While New Mexico has no case law indicating that a tampering with evidence charge cannot be based solely on circumstantial evidence, our cases upholding convictions for this charge involve some kind of direct evidence of tampering. In *State v. Johnson,* 2004–NMSC–029, ¶ 54, 136 N.M. 348, 98 P.3d 998, the defendant indicated the necessary specific intent to "place" the evidence through his testimony that he directed someone to remove the stolen property from his car. In *Rojo,* 1999–NMSC–001, ¶ 26, 126 N.M. 438, 971 P.2d 829, evidence was presented by a witness who testified the defendant stated he killed someone and threw the body in the trash. The victim's body was found in a dumpster, and the Court concluded that "[c]ombined with the other evidence linking Defendant to the murder, it was reasonable for the jury to infer from this statement that Defendant not only killed the victim, but also placed her body in the dumpster." *Id.* Also, because the body was found with no identification and covered in plastic bags and duct tape, the Court determined "it was reasonable for the jury to infer that Defendant intended to prevent his own apprehension, prosecution, or conviction as the victim's murderer." *Id.* In *State v. Roybal,* 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct.App. 1992), the court examined the tampering with evidence statute and determined that the statute required active disruption by the defendant of the investigatory process. In each case examined in its analysis, the Court of Appeals found evidence that the defendant committed one of the acts listed in the tampering with evidence statute: destroying, changing, hiding, placing or fabricating any physical evidence. *Id.* at 34, 846 P.2d at 340. In spite of the evidence presented in *Roybal* that the defendant had dropped narcotics from his hand to the ground when officers approached him, the court found that there was not proof beyond a reasonable doubt that Defendant "formed a specific intent to thwart the officers." *Id.*

{14} Based on these precedents, in order for Defendant's conviction on tampering with evidence to be upheld, there must be sufficient evidence from which the jury can infer: (1) the specific intent of the

Defendant to disrupt the police investigation; and (2) that Defendant actively "destroyed or hid physical evidence." When there is no other evidence of the specific intent of the defendant to disrupt the police investigation, intent is often inferred from an overt act of the defendant. *See Johnson,* 2004–NMSC–029, ¶ 54, 136 N.M. 348, 98 P.3d 998 (where the intent of the defendant was inferred from his instruction to others to remove the stolen property from his car); *Rojo,* 1999–NMSC–001, ¶ 26, 126 N.M. 438, 971 P.2d 829 (where intent to disrupt the investigation was inferred from the act of placing the body in the dumpster with no identification and covered with plastic bags); *Roybal,* 115 N.M. at 34, 846 P.2d at 340 (holding evidence was insufficient for conviction without "evidence either of intent to thwart an investigation or of an act listed in the statute").

{15} Here, we have no evidence of an overt act to destroy or hide any knife or blood stained clothing, if such clothing did in fact exist. Thus, the jury had to infer Defendant's intent to disrupt the investigation without any overt act or any other evidence of intent, and further had to speculate that an overt act of destroying or hiding the knife and possibly blood stained clothing had taken place, based solely on the fact that such evidence was never found. Even while reviewing the evidence "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict," *Cunningham,* 2000–NMSC–009, ¶ 26, 128 N.M. 711, 998 P.2d 176, we find it insufficient to support a finding beyond a reasonable doubt of intent by Defendant to disrupt the police investigation, or that he actively destroyed or hid evidence. The evidence presented by the State that a knife or sharp object existed, that Defendant's clothing might have been blood stained, and that ten days passed between the murder and Defendant's arrest, do not provide the necessary direct or circumstantial evidence to support the charge of tampering with evidence.

{16} Although the State argues that this holding will mean that "a defendant who successfully destroys or hides evidence could never be convicted of his crime," we

disagree. Our holding here does not mean that direct evidence is necessary to prove tampering with evidence. Statements by defendants and witnesses regarding the disposition of evidence may allow a jury to reasonably infer an overt act and intent, as may many other kinds of circumstantial evidence that would tend to prove a defendant acted to tamper with evidence and in so acting intended to thwart a police investigation. Rather, we hold that it is the State's burden to prove each element of the crime beyond a reasonable doubt, and the proof offered here, with no direct or circumstantial evidence regarding an overt act and no reasonable way for a jury to infer intent, falls short of that burden. If we were to hold otherwise, we would render the required elements of the tampering with evidence statute meaningless. Therefore, we reverse Defendant's conviction on the tampering with evidence charge.

## III. IMPROPER QUESTIONING AND FUNDAMENTAL ERROR

{17} Defendant asserts that the State improperly forced Defendant to comment on the credibility of the State's witnesses when the State asked the Defendant on cross-examination whether the State's witnesses were lying. The defense did not object to the State's improper line of questioning. We begin the analysis of this issue by examining the propriety of the prosecutor's questions to Defendant, and then consider whether there was fundamental error.

### A. Improper Questioning by the Prosecutor

{18} In *State v. Flanagan,* 111 N.M. 93, 97, 801 P.2d 675, 679 (Ct.App.1990), the Court of Appeals indicated that a strict prohibition would be imposed upon asking the defendant if another witness is mistaken or lying, particularly "in a criminal case where defendant is forced to characterize numerous witnesses, including police officers, as 'incorrect' or 'mistaken' in order for his or her testimony to be credible." *Id.* In the sixteen years since the Court of Appeals decided *Flanagan,* we have not had occasion to comment on its holding. *Flanagan* has, howev-

er, been cited by other state courts as standing for the proposition that "asking a witness whether another witness has lied is categorically improper." *State v. Morales*, 198 Ariz. 372, 10 P.3d 630, 633 (Ct.App.2000); *see State v. Hart*, 303 Mont. 71, 15 P.3d 917, 923 (2001) (citing *Flanagan* as one of the cases holding that it is categorically improper for the prosecution to ask a defendant whether a witness has lied); and *see State v. Singh*, 259 Conn. 693, 793 A.2d 226, 236 (2002) (referring to "the well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity" and citing *Flanagan* ).

■ {19} The rationale for this strict prohibition upon asking the defendant if another witness is mistaken or lying includes the risk for improper prejudice from these kinds of questions, the fact that "[w]hether the defendant believes the other witnesses were truthful or lying is simply irrelevant," and the concern that these questions "can constitute in effect a misleading argument to the jury that the only alternatives are that the defendant or the witnesses are liars." *Flanagan*, 111 N.M. at 97, 801 P.2d at 679. Some courts have perceived these questions as distorting the burden of proof by unfairly giving the jury the impression that in order to acquit, they must determine that witnesses whose testimony is at odds with the testimony of the defendant are lying. *See State v. Casteneda–Perez*, 61 Wash.App. 354, 810 P.2d 74, 78–79 (1991). Other courts have also based the prohibition on the concept that the jury must determine credibility, not the witnesses. *See Singh*, 793 A.2d at 236. In *State v. Graves*, the Iowa Supreme Court also reasoned that the use of this kind of questioning was incompatible with the duties of a prosecutor:

> Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a

verdict that rests on the evidence and not on passion or prejudice.

668 N.W.2d 860, 873 (Iowa 2003).

{20} We note that as the law on the subject of "were they lying" questions has developed in other states, two state courts have held that asking the defendant whether a witness is lying is not objectionable. *See Dorsey v. State*, 259 Ga. 809, 387 S.E.2d 889, 890 (1990); *Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125, 1163 (Ct.Spec.App.1999), *rev'd in part on other grounds, Fisher v. State*, 367 Md. 218, 786 A.2d 706 (2001). Some courts have agreed with *Flanagan* that such questioning is generally improper, but recognize an exception when the contradiction between the defendant's testimony and that of another witness can only be explained by the conclusion that someone is lying. *Morales*, 10 P.3d at 633–34; *State v. Pilot*, 595 N.W.2d 511, 518 (Minn.1999); *State v. Hart*, 303 Mont. 71, 15 P.3d 917, 924 (2001); *People v. Overlee*, 236 A.D.2d 133, 666 N.Y.S.2d 572 (N.Y.App.Div.1997). The majority of jurisdictions, however, have followed the prohibition of "were they lying" questions. *Graves*, 668 N.W.2d at 871 (citing cases including *Flanagan* ).

■ {21} We agree with the developed reasoning of other courts that have adopted *Flanagan*, that credibility of witnesses is to be determined by the jury, not by the witnesses. *Singh*, 793 A.2d at 236–37. It is not only the credibility of the defendant at issue at trial, but "the credibility of *all* witnesses is at issue." *Graves*, 668 N.W.2d at 872. It is unreasonable and unnecessary to expect a defendant to offer an explanation for contradictory testimony. *Id.* at 872–73. In addition, this kind of questioning is inconsistent with the prosecutor's primary duty to seek justice and provide a fair trial to the defendant. *Id.* at 873. "The state's objective of 'highlighting' inconsistencies in testimony may be accomplished by other, proper means." *Singh*, 793 A.2d at 238. We are particularly concerned that "were they lying questions" may confuse the jury as to the required burden of proof if the jury is led to believe that a defendant is guilty unless a law enforcement officer is lying. Thus, we affirm the holding in *Flanagan* and adopt a strict

prohibition against asking the defendant whether another witness is mistaken or lying.

{22} With respect to the questioning at issue here, four witnesses for the State, Carlos Mondragon, Shonna Romero, Michael Romero, and Deputy Rick Romero, each testified regarding statements made by Defendant. During cross-examination of Defendant, the prosecutor engaged in the following exchange:

Q. [by prosecutor] So, Michael Romero is lying?

A. [by defendant] In my eyes, yes.

Q. In your eyes?

A. Yes.

Q. And Carlos Mondragon was lying?

A. Yes, sir.

Q. And Shonna Romero was lying?

A. Yes, sir.

Q. And interestingly enough, even Deputy Rick Romero was lying?

A. Yeah, well, basically—

Q. Sir?

A. Yes, Sir.

Q. So you have been sitting here in trial for a few days now; is that correct?

A. Yes, sir.

Q. And everybody's lying except you; is that right?

A. Yes, sir.

Q. Now it hasn't—maybe you could help us here. Why would all these people lie against you?

A. In my words, again, sir, either people don't like me; people want to see somebody go down for something; or in other words, that they hate on you, because of something that you did, used to have, or something that you have accomplished in your life, and that's the reason why I think so.

Q. And I think that's a fair assessment, but I think the ladies and gentlemen of the jury need to know why Shonna, Carlos and Michael and Deputy Romero would get together to do this to you?

A. From that point, I can't really help you out there. I don't think so.

Q. All right.

Since we decline to overrule the strict language of *Flanagan* prohibiting questions to the defendant as to whether another witness is mistaken or lying, we must conclude that these questions by the prosecutor were improper. We note that in *Flanagan,* however, the improper questioning was correctly objected to by the defendant, and the review was for reversible error, with the burden on the State to show the error was harmless. 111 N.M. at 96, 801 P.2d at 678. Since no objection was made in the present case, Defendant failed to preserve any error regarding the prosecutor's improper questioning. "When the trial court had no opportunity to rule on [a claimed error] because the defendant did not object in a timely manner, we review the claim on appeal for fundamental error." *State v. Allen,* 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728.

**B. Fundamental Error**

{23} Whether this improper questioning rises to the level of fundamental error is the controlling inquiry. Although many of our cases regarding fundamental error "turn on the obvious innocence of the defendant," *State v. Barber,* 2004–NMSC–019, ¶ 16, 135 N.M. 621, 92 P.3d 633, "we also recognize that another strand runs through the fundamental error doctrine that focuses less on guilt and innocence and more on process and the underlying integrity of our judicial system." *Id.* at ¶ 17. Fundamental error occurs when a case "would so shock the conscience of the court as to call for a reversal." *State v. Garcia,* 46 N.M. 302, 309, 128 P.2d 459, 462 (1942). "This 'shock the conscience' language has been used both to describe cases with defendants who are indisputably innocent, and cases in which a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Barber,* 2004–NMSC–019, ¶ 17, 135 N.M. 621, 92 P.3d 633. We do not believe this is a case where the defendant is indisputably innocent. *See State v. Garcia,* 19 N.M. 414, 418–422, 143 P. 1012, 1013–1015 (1914) (describing the defendant as unconscious when the charged murder was committed and holding that the evidence conclusively established his innocence).

Our precedent indicates, therefore, that to find fundamental error we must determine whether the improper questioning by the prosecutor "caused such a 'fundamental unfairness' in Defendant's trial." *Barber*, 2004–NMSC–019, ¶ 18, 135 N.M. 621, 92 P.3d 633 (quoting *Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176).

{24} Looking at the improper questioning in this case, we note that the prosecutor asked four direct "were they lying" questions, as well as a general "so everybody is lying but you" question, and a question asking Defendant to explain why those witnesses would lie. We are especially concerned about the prosecutor's question to the defendant asking if "even" Deputy Rick Romero was lying. As was stated in *Flanagan*, it is particularly improper to ask the defendant to comment on the veracity or credibility of law enforcement officers, as it may lead the jury to believe that they cannot acquit the defendant unless they believe the officer is lying. 111 N.M. at 97, 801 P.2d at 679.

{25} We believe whether a defendant "opens the door" by commenting on the veracity of other witnesses is an important consideration in determining whether there was fundamental unfairness in a trial. When a defendant does not initiate any comment on the truthfulness of the testimony of other witnesses, we will consider the actions of a prosecutor who improperly pursues "were they lying" questions to be prosecutorial misconduct. In this case, however, we believe Defendant initiated the comments on the other witnesses' veracity when he stated during direct examination that the witnesses had falsely accused him. While apologizing for his outburst [1] during the testimony of one of the witnesses, Defendant testified:

> Yeah, I apologize, you know what I mean? At some point in time, I mean it's like if somebody just keeps on kicking and kicking and kicking at you, you know, what I mean, especially making false accusations toward you, and you know, basically slandering your name. I got upset. Who doesn't get angry?

The fact that Defendant accused the witnesses of making "false accusations" about him leads us to conclude that, although the "were they lying" questions were improper, they were not unprovoked.

{26} When reviewing for fundamental error in other situations of improper comments by prosecutors, we have considered the improper comments in the context of the prosecutor's argument as a whole. *See Allen*, 2000–NMSC–002, ¶ 98, 128 N.M. 482, 994 P.2d 728. Here, we note that the prosecutor's improper questions were only a small portion of the total trial. We do not find that the improper questions went so far as to distort the burden of proof, which we believe is one of the considerable dangers of "were they lying" questions. The jury would not have been led to believe by these questions that the burden was on the Defendant to prove that the witnesses were lying.

{27} We do not believe the improper questioning resulted in fundamental unfairness in Defendant's trial. Defendant provoked the questions by commenting on the "false accusations" of the other witnesses, and the improper questions were a minimal part of the total trial. While we do not in any way approve of the prosecutor's use of "were they lying" questions, we find that, overall, Defendant received a fair trial. Since the prosecutor's improper questioning did not make Defendant's trial fundamentally unfair, we conclude that the improper questioning did not rise to the level of fundamental error.

## IV. CONCLUSION

{28} We conclude that sufficient evidence supported the jury's finding that Defendant acted with deliberate intent, and affirm the conviction of first-degree murder. We conclude that there was insufficient evidence to support the charge of tampering with evidence, and we reverse the conviction for tampering with evidence. Despite the inappropriate cross-examination by the prosecu-

---

1. During the testimony of Michael Romero, Defendant shouted out to him: "I'll kick your balls off, you puto."

tion, we do not believe that fundamental error occurred in this case.

{29} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.