This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**

**Filing Date: September 20, 2011**

**NO. 32,236**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

**v.**

**AUBREY SAVAGE,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**William G W. Shoobridge, District Judge**

McGarry Law Office
Kathleen McGarry
Glorieta, NM

for Appellant

Gary K. King, Attorney General

William H. Lazar, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**MAES, Justice.**

Aubrey Savage (Defendant) was charged with first degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and possession of a firearm by a felon, contrary to NMSA 1978, Section 30-7-16 (2001), in connection with the shooting death of Yurhonnd DeLoach (Victim) at the Elks Club in Hobbs, N.M. Defendant pled guilty to the felon in possession charge, and he was convicted of first degree murder following a jury trial. Defendant appeals directly to this Court pursuant to Rule 12-102(A)(1) NMRA, claiming that (1) there was insufficient evidence to convict him of first degree murder; (2) the district court improperly refused his requested instructions on voluntary and involuntary manslaughter; and (3) the district court improperly admitted testimony by the supervising pathologist, as opposed to the pathologist who conducted Victim's autopsy, in violation of the Confrontation Clause. We affirm Defendant's convictions.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

On the night of January 18, 2009, Defendant was at the Elks Club (the club) in Hobbs, N.M. Defendant, a local, was at the club with several friends, including Marshall "Taz" Jackson. Also at the club that evening were several men from Mississippi who came to New Mexico to work on a construction project in Eunice. Among the group of co-workers was Yurhonnd DeLoach (Victim) and his fiancée Arteca Heckard.

Tensions rose between Defendant, his friend Jackson, and Recordo Owens, one of the Mississippi co-workers, in the restroom of the club. Owens was using the restroom when Jackson told him to hurry up. Owens responded that he would not be rushed. Jackson said that he had "too many heats" and pulled a gun from his waistband and handed it to Defendant, who placed it in his own waistband. It was a large caliber firearm, either a .45 or a .40.

Following the altercation in the restroom, the club operator turned on the lights and announced that patrons should leave. Owens and his cousin left the club together. As they were approaching the cousin's truck, Defendant walked up to them with the gun at his waist and said, "Say something else, nigger. Say something else." Owens and his cousin continued toward the truck.

Defendant then walked up behind another of the Mississippi co-workers, Dewatrick Tate, who was exiting the club with a friend. According to Tate, Defendant "asked us, 'Did we have a problem?'" Tate and his friend replied that they did not. Defendant tried to force himself between Tate and his friend, brandished the gun and asked, "Which one of y'all's saying something?" Tate and his friend continued toward their vehicle.

Victim then exited the club with Heckard. Heckard testified that Victim wanted to walk toward the argument occurring between Defendant and the Mississippi co-workers, but Heckard urged that he go the other way. Victim did not heed her and walked toward the argument. Victim was pushed by someone in the crowd, and he exclaimed, "Get your hands off me, I ain't in with this." Someone in the crowd responded, "Aren't you from Mississippi?" He replied, "Yeah, I'm from Mississippi." The person in the crowd responded, "Well, you in it." Defendant fired once into the air, then he cocked his gun and shot at Victim multiple times.

Victim was struck at least five times, once in the chest and four times in the back. Two large caliber bullets and one small caliber bullet were recovered during the autopsy. Two wounds did not produce projectiles, as the bullets both

entered and exited Victim's body. Five of the gunshot wounds Victim sustained were potentially fatal; a sixth wound, a graze wound on Victim's neck, was not potentially fatal.

Following a jury trial, Defendant was sentenced to a term of eighteen months for the felon in possession charge and to a term of life for the first degree murder charge, to be served consecutively. He appeals his convictions directly to this Court. We exercise appellate jurisdiction where life imprisonment has been imposed. N.M. Const. art. VI, § 2; *see* Rule 12-102(A)(1) (appeal from sentence of life imprisonment taken directly to Supreme Court).

**II.     DISCUSSION**

**A.     There was sufficient evidence of deliberate intent to support a conviction of first degree murder.**

Defendant contends that there was insufficient evidence to convict him of first degree murder, claiming that the evidence supports a "rash and impulsive crime," and no planning went into the killing. He argues that there was insufficient evidence to prove beyond a reasonable doubt that he harbored a deliberate intent to kill Victim, and thus his conviction for first degree murder should be reversed.

In response, the State claims that there was sufficient evidence to support Defendant's deliberate intent to kill. To support deliberate intent, the State relies upon the fact that Defendant threatened Owens, Owens's cousin, Tate, and Tate's friend immediately before the shooting. The State also relies on the manner of the shooting to support deliberate intent. Defendant shot Victim multiple times in the back, and according to the State, this "leave[s] little doubt as to his deliberate intent."

"The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). This Court views "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

The requisite state of mind for first degree murder is a "willful, deliberate and premeditated" intention to kill. Section 30-2-1(A)(1); *see also State v. Adonis*, 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P. 3d 717; *State v. Garcia*,

114 N.M. 269, 271; 837 P.2d, 862, 864 (1992). "The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. Though deliberate intent requires a "calculated judgment" to kill, the weighing required for deliberate intent "may be arrived at in a short period of time." *Id.* In determining whether a defendant made a calculated judgment to kill, the jury may infer intent from circumstantial evidence; direct evidence of a defendant's state of mind is not required. *State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515.

Viewing the evidence in a light most favorable to the verdict, there was sufficient evidence of Defendant's deliberate intent to kill Victim. Here, deliberate intent may be inferred from Defendant's aggressive posturing outside the club. Defendant approached two of the Mississippi co-workers, Owens and Tate, and challenged them to say something to him. The large caliber gun was visible in Defendant's waistband when he attempted to provoke Owen and Owen's cousin. When he approached Tate and his friend, Defendant brandished the firearm and tried to force himself between the two. Defendant's aggressive behavior toward the Mississippi co-workers suggests that he acted pursuant to a

deliberate intent, rather than an "unconsidered and rash impulse" in shooting Victim.  UJI 14-201.

In addition to Defendant's aggressive behavior toward the Mississippi co-workers, the manner of the shooting showed that Defendant harbored a deliberate intent to kill Victim.  *See, e.g.*, *Riley*, 2010-NMSC-005, ¶ 20 (relying on, inter alia, multiple gunshots fired by the defendant to demonstrate deliberate intent); *Duran*, 2006-NMSC-035, ¶ 8 (relying on, inter alia, multiple stab wounds in the victim's back); *State v. Coffin*, 1999-NMSC-038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (relying on, inter alia, the fact that the victim suffered multiple gunshot wounds in the back).  Here, Owens testified that he heard multiple gunshots, and the autopsy revealed that Victim was shot at least five times.  Four wounds had a back-to-front trajectory, which would be consistent with Defendant's continued aggression even though Victim either fell or tried to back away.

Viewing the evidence in a light most favorable to the verdict, we conclude that a reasonable jury could infer from Defendant's aggressive posturing and the manner in which the shooting was conducted that Defendant formed his intent to kill Victim after weighing the considerations for and against the killing.

Accordingly, there was sufficient evidence to support Defendant's first degree murder conviction.

**B.** **The district court did not commit error in refusing Defendant's requested instructions on voluntary and involuntary manslaughter.**

The jury was instructed on first and second degree murder. The Defendant requested instructions of voluntary and involuntary manslaughter. Both manslaughter instructions were denied. Defendant contends there was sufficient evidence to require giving both manslaughter instructions, and it was error for the district court to deny his requested manslaughter instructions.

The question of whether the jury was properly instructed is a mixed question of fact and law which this Court reviews de novo. *State v. Henley*, 2010-NMSC-039, ¶ 12, 148 N.M. 359, 237 P.3d 103. "A defendant is entitled to an instruction on a lesser included offense when there is some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view [is] reasonable." *State v. Gaitan*, 2002-NMSC-007, ¶ 11, 131 N.M. 758, 42. P.3d 1207 (alteration in original) (internal quotation marks and citation omitted). This Court reviews the evidence in the light most favorable to giving the requested instruction. *Henley*, 2010-NMSC-039, ¶ 25. "When evidence at trial supports the giving of an instruction on a defendant's

8

theory of the case, failure to so instruct is reversible error." *Id.* (internal quotation marks and citation omitted).

## 1. Voluntary Manslaughter

Generally, manslaughter is the "unlawful killing of a human being without malice." NMSA 1978, § 30-2-3 (1994). Voluntary manslaughter is a killing "committed upon a sudden quarrel or in the heat of passion." Section 30-2-3(A). However, upon sufficient provocation, second degree murder may be mitigated to manslaughter. *See Gaitan*, 2002-NMSC-007, ¶ 11; UJI 14-220 NMRA ("The difference between second degree murder and voluntary manslaughter is sufficient provocation."). Sufficient provocation is "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions." UJI 14-222 NMRA. Sufficient provocation causes a loss of the "ability to reason" and a "temporary loss of self control in an ordinary person of average disposition." *Id.* However, if "an ordinary person would have cooled off before acting," the provocation is not sufficient. *Id.* Moreover, there also must be evidence that the acts of provocation by the victim are not the result of intentional acts of the defendant. *State v. Padilla*, 104 N.M. 446, 448, 722 P.2d 697, 699 (Ct. App. 1986) (citing *State v. Manus*, 93 N.M. 95, 597 P.2d 280

9

(1979)).  When a defendant "*intentionally* provokes an attack so that he can use that attack as an excuse for killing, he is guilty of murder," rather than manslaughter.  *Gaitan*, 2002-NMSC-007, ¶ 13.

Defendant asserts  that the evidence demonstrated that "tempers were running high" between the Mississippi co-workers and the group of locals.  Although incidents occurred earlier in the evening between the local group and the Mississippi co-workers, Defendant did not pull out a gun until the physical altercation between the groups began.  Additionally, Defendant points to evidence of other weapons in the vicinity of the altercation (a knife and casings from a 9mm gun were found).  He notes that Victim was "drunk and argumentative."  Defendant claims this was "sufficient evidence to merit a manslaughter instruction."

The State argues that Defendant was not entitled to an instruction on voluntary manslaughter because he provoked the violence that resulted in Victim's death.  The State notes that Defendant was a member of the group who began the altercation with Owens inside the club's restroom.  The State claims Defendant was trying to instigate violence by assailing the Mississippi co-workers while brandishing a weapon.  The State further maintains that Victim did

not approach the altercation outside of the club until after Defendant had joined the argument. The State also contests the notion that Victim provoked Defendant "to kill without malice." The State notes that for voluntary manslaughter there must be sufficient provocation "to obscure the reason of an ordinary man, and to prevent deliberation and premeditation, and to exclude malice and to render [a] defendant incapable of cool reflection." *State v. Kidd*, 24 N.M. 572, 577, 175 P. 772, 774 (1917).

Viewing the evidence in the light most favorable to giving an instruction on voluntary manslaughter, *State v. Romero*, 2005-NMCA-060, ¶ 8, 137 N.M. 456, 112 P. 3d 1113, there was insufficient evidence that Victim's actions would arouse in Defendant "anger, rage, fear, sudden resentment, terror or other extreme emotions," enough to affect his ability to reason or experience a "temporary loss of self-control," UJI 14-222. The trial evidence showed that Defendant was a principal actor in the assault upon the Mississippi co-workers. The assault began in the club's restroom and moved to the sidewalk outside. Defendant then approached several of the Mississippi co-workers, brandishing his weapon and attempting to instigate a conflict. Therefore, because Defendant provoked the hostility between the two groups, his claim that he was moved to a state of

11

"anger, rage, fear, sudden resentment, terror or other extreme emotions" lacks merit. UJI 14-222.

We have found sufficient provocation where a defendant fears that the victim is reaching for a gun, *State v. Jernigan*, 2006-NMSC-003, ¶25, 139 N.M. 1, 127 P.3d 537, or where a defendant receives extremely shocking information, *Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982). No such extreme circumstances were evident in this case. Defendant relies on general allegations that there were rising tensions between him and the Mississippi co-workers. Furthermore, Victim's actions were not enough to arouse sufficient provocation of Defendant. Victim walked over to where the group of locals and his co-workers were arguing, a fist was swung at him, and Victim merely swung back at someone in the crowd. Defendant, outside of the crowd and to the right, then cocked his gun and fired at Victim. Victim was shot at least five times, once in the chest and four times in the back. Victim's actions were simply not sufficient to cause Defendant to temporarily lose his ability to reason and his self-control. Therefore, there was not sufficient evidence to require an instruction on voluntary manslaughter.

**2. Involuntary Manslaughter**

12

Involuntary manslaughter is "manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection." Section 30-2-3(B). "An involuntary manslaughter jury instruction is proper only when the evidence presented at trial permits the jury to find the defendant had a mental state of criminal negligence." *Henley*, 2010-NMSC-039, ¶ 3; *see also id.* ¶ 22. Criminal negligence is "conduct which is reckless, wanton, or willful." *State v. Mascarenas*, 2000-NMSC-017, ¶ 9, 129 N.M. 230, 4 P.3d 1221 (internal quotation marks and citation omitted).

In support of his claim that he was entitled to an instruction on involuntary manslaughter, Defendant relies on evidence that there was a lot of shooting and that he shot his gun randomly into the air. Defendant also notes that Heckard was the only witness to testify seeing Defendant shoot Victim. Thus, Defendant suggests that carrying a weapon and firing randomly "would support criminal negligence."

The State claims that Defendant's argument with respect to the involuntary manslaughter instruction was not properly preserved. The State notes that at trial, Defendant requested an involuntary manslaughter instruction because "the

13

evidence that Defendant was in the nightclub supported an inference that he was *intoxicated*, and that this supported a further inference that he shot [Victim] negligently." (Emphasis added.) Because the instruction was requested upon a different theory, the State claims this count of error was not preserved. Defendant's requested instruction did include mention of intoxication. However, the instruction fairly read, also referred to the Defendant's action of negligently firing a gun." Accordingly, Defendant is not arguing on an entirely new, unpreserved theory.

The State argues that an instruction on involuntary manslaughter is only appropriate when the defendant acts with a mens rea of criminal negligence. *Henley*, 2010-NMSC-039, ¶ 22. Here, the State claims the killing was intentional, and therefore, Defendant did not act with a mens rea of criminal negligence. Specifically, the State claims that the evidence that Defendant had brandished his weapon and made implicit threats to shoot Owens and Tate demonstrates he acted intentionally, rather than negligently, in killing Victim.

We recognize that only some reasonable view of the evidence is necessary for an instruction on a lesser-included offense, such as involuntary manslaughter. *Gaitan*, 2002-NMSC-007, ¶ 11. Aside from the one random gunshot in the air,

14

the most favorable view of the evidence demonstrates that the gravity of Defendant's actions exceeded criminally negligence. That Defendant fired one gunshot indiscriminately into the air does not establish that the subsequent gunshots fired at Victim were a result of unintentional actions. Such action is murder, not manslaughter. *See Henley*, 2010-NMSC-039, ¶ 14 (citing *State v. Pruett*, 27 N.M. 576, 579, 203 P. 840, 841 (1921). There was no error in refusing Defendant's requested involuntary manslaughter instruction.

**C.** **Testimony by the supervising pathologist, as opposed to the pathologist who conducted Victim's autopsy, did not violate the Confrontation Clause.**

The Confrontation Clause ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Thus, the Confrontation Clause bars "[o]ut-of-court testimonial statements . . . unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *State v. Zamarripa*, 2009-NMSC-001, ¶ 23, 145 N.M. 402, 199 P.3d 846. Whether evidence was admitted in violation of the Confrontation Clause is a question of law which this Court reviews de novo. *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280.

15

At trial, the State proffered the expert testimony of Dr. Kurt Nolte, a forensic pathologist working as the Assistant Chief Medical Investigator for the State of New Mexico. In this role, he trains forensic pathology fellows and supervises them as they conduct autopsies. One of the pathology fellows, Dr. Lauren Jackson, was assigned to conduct Victim's autopsy under Dr. Nolte's supervision.

Typically, Dr. Nolte meets with the fellows and together they determine the steps needed to complete a particular autopsy. The fellows then initiate dissection while Dr. Nolte moves from table to table observing their findings. Up to six autopsies may be conducted simultaneously; two supervisors are present and each typically oversees three autopsies.

Dr. Jackson struggled to dissect several of the gunshot wounds because they "were complex and had intersecting paths." As a result, Dr. Nolte personally participated in the dissection and helped Dr. Jackson understand the gunshot wounds. Specifically, Dr. Nolte participated in dissecting the wound that began in the right upper back and involved injury to the diaphragm, as well as two other wounds.

16

After Victim's autopsy was completed, Dr. Jackson prepared an autopsy report reflecting the nature and extent of Victim's injuries. The report was reviewed for accuracy by Dr. Nolte and was then signed by both Dr. Nolte and Dr. Jackson. The report, however, was not admitted at trial.

Defendant claims that the State's decision to call Dr. Nolte instead of Dr. Jackson deprived him of his right to confrontation. Defendant maintains that because Dr. Jackson did not testify, he "did not have the opportunity to confront the person who had actually performed the autopsy in this case." Defendant also objects to Dr. Nolte's reliance on the autopsy report, which was written by Dr. Jackson, but reflected their joint findings. Defendant cites *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), and this Court's opinion in *Aragon* in support of his arguments.

In *Melendez-Diaz*, the U.S. Supreme Court held that laboratory certificates, which stated that evidence found in the defendant's possession was cocaine of a certain weight, were testimonial in nature. 129 S. Ct. at 2531-32. Accordingly, the defendant was entitled to confront the analyst who had tested the evidence and produced the certificate at trial. *Id.* at 2542.

In *Aragon*, a forensic chemist, Eric Young, analyzed the contents of a plastic baggie found by police in a home where the defendant was hiding. 2010-NMSC-008, ¶¶ 3-4. Young determined that the baggie contained methamphetamine. *Id.* ¶ 4. Young's colleague, Andrea Champagne, analyzed the contents of a second plastic baggie and determined that the second baggie contained methamphetamine. *Id.* Each chemist prepared a report reflecting their respective findings, and both reports were admitted at trial. *Id.* However, only Young testified, and the trial court permitted him to discuss Champagne's testing and report regarding the second baggie, even though Young did not "observe, supervise, or participate in either the analysis or the preparation of the report." *Id.* ¶ 5. On these facts, this Court found that the defendant's confrontation rights had been violated. *Id.* ¶ 33.

Defendant's reliance on *Melendez-Diaz* and *Aragon* is misplaced. In *Melendez-Diaz*, the defendant had no opportunity to confront the laboratory analyst who performed the tests, and the laboratory certificates were admitted without the benefit of live testimony. 129 S. Ct. at 2531. By contrast, in this case, Dr. Nolte provided in-court testimony regarding the autopsy and was cross-examined by Defendant. Defendant's case is also distinguishable from *Aragon*.

18

In *Aragon*, the trial court allowed Young's testimony regarding the chemical analysis of the second baggie even though Young did not conduct the testing and had no personal knowledge of it. 2010-NMSC-008, ¶ 5. Additionally, the Court admitted the report discussing the contents of the second baggie. *Id.* Here, the district court did not admit the autopsy report, and Dr. Nolte did not testify as to a laboratory process conducted by another individual of which he had no personal knowledge. He testified as to an autopsy which he supervised and, indeed, participated in himself. Thus, we conclude that Defendant's confrontation rights were not violated.

## III.   CONCLUSION

We hold that (1) there was sufficient evidence of Defendant's deliberate intent in order to support his first degree murder conviction, (2) the district court did not err in refusing Defendant's requested instructions on voluntary and involuntary manslaughter, and (3) admitting testimony by the supervising pathologist who personally participated in Victim's autopsy did not violate Defendant's rights under the Confrontation Clause. We affirm Defendant's convictions.

**IT IS SO ORDERED.**

19

_____

**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

20