This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: May 1, 2026**

**No. S-1-SC-40588**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CHRISTOPHER MALDONADO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Thomas J. Lewis, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Teresa Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

**{1}** A jury convicted Defendant of first-degree felony murder contrary to NMSA 1978, Section 30-2-1(B) (1994) and related offenses in connection with the shooting death of Rony Carrera-Flores (Victim). Evidence at trial showed that Defendant and two other individuals conspired to rob Victim at gunpoint leading to Victim's death. On direct appeal to this Court, Defendant argues that (1) the evidence was insufficient to find him

guilty beyond a reasonable doubt because his convictions were based on uncorroborated accomplice witness testimony; and (2) the district court's instructions confused and misled the jury on the difference between the elements of the crimes charged. We affirm Defendant's convictions by nonprecedential decision. Rule 12-405(B)(1), (2) NMRA.

## I.  BACKGROUND

**{2}**     The evidence presented at trial included testimony from Victim's friend, Rosalva Martinez (Rosalva), Detective Ian Melville, and co-conspirator, Monique Montano (Monique). Rosalva testified that she joined Victim on a road trip from California to Ohio, the purpose of which was to transport several pounds of methamphetamine. During their drive through New Mexico, Victim's car broke down in Cline's Corners and was towed to Albuquerque. Once in Albuquerque, Victim, Rosalva, and the car were dropped off at a store parking lot. Victim and Rosalva walked to the nearest motel to get a room, but they had a difficult time reserving a room because they did not have a credit card. While hanging around the motel, a man named Triste, who was staying at a nearby Travelodge with two friends, Wendy and Amber, approached Victim. Triste convinced Victim and Rosalva to stay at the Travelodge where he, Wendy, and Amber were staying.

**{3}**     After Victim and Rosalva met Wendy and Amber, Amber booked Victim and Rosalva a room at the Travelodge. Wendy told Victim her uncle could fix his car and had the uncle come to the Travelodge to look at the car and meet Victim. Rosalva did not remember how long they stayed at the Travelodge, only that Victim was spending a lot of money with the group over the span of several days. Rosalva was concerned Victim was too friendly with the group and avoided hanging out with them by spending most of her time at a nearby Walmart or the motel room. Further, Rosalva was aware Victim was having conversations with Triste, Wendy, Amber, and other members of their group of friends about what to do with the drugs Victim was transporting. Rosalva was not involved in the conversations with Victim and the group regarding the drugs.

**{4}**     On the April night in question, at around three or four in the morning, Rosalva was awakened when Amber and Victim entered the motel room she shared with Victim. After a few minutes, Amber left. Victim was then sitting on his bed talking to Rosalva when they heard a knock on the door. Victim answered the door, and a woman later identified as Monique asked Victim if someone named Nicole was in the room. Victim responded "no" and tried to close the door, but Monique stuck her foot in the room blocking the door from closing and let herself in. Once inside the room, Monique asked to use Victim's cell phone. Monique then made two phone calls to Defendant. Rosalva testified that when Monique was making the phone calls she was pacing back and forth and looking out the open door and the window "like she was waiting for someone." Monique also asked Victim if she could borrow a sweater because she was cold.

**{5}**     A couple of minutes later, a man, later identified as Defendant, came running into the room through the open door. Defendant's face was covered with a bandana, he was wearing a hoodie, and he was holding a gun in one hand. Defendant pointed the gun at

Victim and demanded Victim give him everything he had. Victim reached for the gun in Defendant's hand causing the gun to fire, shooting Victim in the face. Defendant then ran out of the room with the gun still in his hand. Monique grabbed a large box from the room and ran out of the room following Defendant.

**{6}** Rosalva ran outside and saw Amber, who was exchanging words with Defendant. Rosalva testified that Amber looked mad and was calling Defendant "Night Owl." Following this interaction, Rosalva saw Defendant get into a white car and drive off. Rosalva also saw Wendy soon after the shooting with a shotgun and heard Wendy say, "Why did you do this Night Owl." Rosalva believed Victim was set up and that Monique was involved in the plan because Rosalva saw Monique get into the white car with Defendant after the shooting.

**{7}** Detective Melville testified that Defendant was identified as a suspect to the homicide after cell phone extractions from Rosalva's cell phone and interviews with Amber, Wendy, and other members of the group of friends implicated both Defendant and Monique. Detective Melville reviewed video surveillance from the motel parking lot the day of the shooting and identified a white car that was owned by Genea Oliver, Defendant's ex-wife and the driver of the car. The video surveillance showed an individual exit the car, jump a fence, and walk toward Victim's room. Moments later a second individual exited the passenger side of the white car and took the same route to Victim's room.

**{8}** Detective Melville identified Monique in the motel parking lot shortly after the shooting holding a large box and wearing a sweater not seen on her previously. Based on Detective Melville's investigation, arrest warrants were issued for Defendant, Monique, and Genea. Genea passed away before Defendant's trial.

**{9}** Monique, who entered into a plea agreement with the State, testified at trial that she, Genea, and Defendant—the latter a person Monique had known for six years—conspired to rob Victim. Monique knew Defendant by the nickname "Night Owl." On the night of the shooting, Monique was the "outlook," tasked with gaining access to Victim's room. Defendant and Genea were waiting in the white car parked adjacent to the motel. Consistent with Rosalva's testimony, Monique testified that Victim let her borrow a sweater and that she (Monique) called Defendant twice with Victim's cell phone. Monique called Defendant to let him know that "everything was okay," a signal for Defendant to come to the room.

**{10}** Monique identified Defendant as the individual depicted in the surveillance video getting out of the car and running into Victim's room. Defendant wore a mask and a hood, and was holding a gun. Monique testified that Defendant pointed the gun at Victim's face, and Victim struck the gun in Defendant's hand causing it to discharge. Defendant took off running, gun in hand; Monique followed. Defendant did not take anything from the room and Monique took a large box. Defendant, Monique, and Genea drove off in the white car.

**{11}** Procedurally speaking, the State charged Defendant in count one of the indictment with first-degree deliberate-intent murder and first-degree felony murder as an alternative charge. The State also charged Defendant with armed robbery and conspiracy to commit armed robbery. The State included the lesser-included offenses and step-down instructions for second-degree murder and voluntary manslaughter. After the State rested its case, Defendant moved for a directed verdict on all counts. The motion was denied.

**{12}** The jury initially found Defendant guilty of second-degree murder as a lesser-included offense of first-degree deliberate-intent murder, as well as armed robbery, and conspiracy to commit armed robbery. The judge asked if the jury was able to reach a verdict on felony murder, the alternative to count one. The foreperson responded that the jurors thought that because "we came to a verdict on count one, we didn't need to address the verdict on the alternative to count one." The judge clarified that there was another instruction in the jury instruction packet that indicated that each crime and the alternative to each crime were to be considered separately, and inquired whether "further deliberations would be fruitful." The juror foreperson responded that the jury had "carried out their deliberations but should probably take a minute to just make sure everybody is on the same page." The jury returned a few minutes later with an explicit guilty verdict of felony murder. Defendant received a life sentence for felony murder and an additional three years for conspiracy to commit armed robbery. Defendant now appeals his convictions.

## II. DISCUSSION

### A. Standard of Review

**{13}** Evidence is sufficient to sustain a conviction if substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt as to every essential element of the offense. *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056. "In reviewing the sufficiency of the evidence, the reviewing court views the evidence in the light most favorable to the guilty verdict, indulging all reasonable inference and resolving all conflicts in the evidence in favor of the verdict." *Id.* (brackets, internal quotation marks, and citation omitted). During this review process, "[w]e do not search for inferences supporting a contrary verdict or re-weigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285. Instead, "[w]e view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict," *id.*, while at the same time asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *id.* ¶ 7 (internal quotation marks and citation omitted). *See also State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." (internal quotation marks and citation omitted)). The sufficiency of the evidence is measured against the jury instructions, which "become the law of the case." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted).

**B.     Monique's Testimony Was Sufficient to Identify Defendant as the Shooter**

**{14}**     Defendant argues that the accomplice witness testimony offered by Monique was insufficient to prove him guilty beyond a reasonable doubt because Monique's testimony was the only evidence identifying Defendant as the shooter. Defendant further argues that because Monique was an accomplice her uncorroborated testimony was inherently biased. We disagree on both counts.

**{15}**     For the jury to convict Defendant of felony murder, it had to find that (1) Defendant committed the crime of armed robbery in a manner dangerous to human life, (2) Defendant caused the death of Victim, (3) Defendant intended to kill or knew his acts created a strong probability of death or great bodily harm, and (4) Defendant did not act as a result of sufficient provocation. *See* UJI 14-202 NMRA. The State presented sufficient evidence to allow the jury to do just that.

**{16}**     This is largely because Monique's testimony was not the only evidence that identified Defendant as the shooter. Before Monique confessed, Detective Melville investigated the individuals in the surveillance video and identified Defendant as a suspect. Detective Melville interviewed Rosalva, Amber, Wendy, and other individuals who stated Defendant, Monique, and Genea were all involved in the planned scheme. Additionally, Detective Melville's investigation revealed a photo of Monique and Defendant from Monique's Facebook account predating the incident. In a comment posted by Monique, she identified Defendant as "nite owl my husband" and confirmed at trial that Defendant's nickname was "Night Owl." Further, Rosalva's testimony indicated that she saw Monique drive off with Defendant in the white car and heard Amber and Wendy both refer to Defendant as "Night Owl" after the shooting. This additional evidence was corroborative of Monique's firsthand account of events. *See generally* 29A Am. Jur. 2d *Evidence* § 1363 (2019) ("Corroborating accomplice evidence must relate to some act or fact which is an element of the crime, but it is not necessary that such evidence be sufficient in itself to establish every element of the offense charged.").

**{17}**     Here, the jury was free to reject Defendant's arguments that Monique could have been referring to another "Night Owl," or alternatively, that Monique was biased, based on the evidence and testimony at trial. *See State v. Revels*, 2025-NMSC-021, ¶ 58, 572 P.3d 974 (stating that we do not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence, and we do not weigh the evidence or substitute our judgment for that of the fact finder).

**{18}**     Because Monique's testimony was neither uncorroborated nor inherently improbable, we agree with the State that this is not an appropriate case to revisit our long line of precedents that allow uncorroborated accomplice testimony to support a conviction, as Defendant requests. *See, e.g.*, *State v. Kidd*, 1929-NMSC-025, ¶ 3, 34 N.M. 84, 278 P. 214 ("The uncorroborated testimony of an accomplice is sufficient in law to support a verdict."); *State v. Gutierrez*, 1965-NMSC-143, ¶ 4, 75 N.M. 580, 408 P.2d 503 ("[T]he rule in this jurisdiction is that a defendant may be convicted on the uncorroborated testimony of an accomplice."). As this Court stated in *State v. Sarracino*, even if the rule were different and "New Mexico courts were to require corroboration of

accomplice testimony, the State offered sufficient corroborating evidence [in this case] to justify [a] trial court's [refusal] to give [a] tendered [accomplice witness] instruction." 1998-NMSC-022, ¶ 17, 125 N.M. 511, 964 P.2d 72.

**{19}** Viewing the evidence in its entirety, a reasonable jury could have found that Defendant was the masked individual who shot Victim. We conclude that the State presented sufficient evidence to allow a rational trier of fact to find Defendant guilty of first-degree felony murder beyond a reasonable doubt.

## C.  The Uniform Jury Instructions Given by the District Court Were Appropriate

**{20}** Defendant next argues, under *State v. Franklin*, 1967-NMSC-151, ¶ 9, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, ¶¶ 17-24, 103 N.M. 655, 712 P.2d 1, that the district court's instructions confused and misled the jury on the difference between the elements of first-degree deliberate intent murder and first-degree felony murder. As Defendant would have it, the duplicate instructions for the lesser-included offenses created juror confusion as reflected by the jury's initial return of a verdict finding Defendant guilty of the lesser-included offense of second-degree murder—as well as armed robbery and conspiracy to commit armed robbery—but no verdict on the alternative charge of felony murder. Because the jury was required to consider the alternative charge of felony murder separately from deliberate-intent murder before moving on to the lesser-included offenses, but did not do so, Defendant argues this was error. Again, we disagree.

**{21}** Defendant concedes that he did not object to the jury instructions below, and that he must therefore demonstrate fundamental error instead of reversible error. *See* Rule 12-216(B)(2) NMRA (limiting appellate review to issues properly preserved by invoking the trial court's discretion); *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (stating that unpreserved errors in jury instructions are reviewed for fundamental error). To find error, we first determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Veleta*, 2023-NMSC-024, ¶ 19, 538 P.3d. If there was error, then we look at its impact on the verdict for a "miscarriage of justice." *State v. Silva*, 2008-NMSC-051, ¶ 13, 192 P.3d 1192.

**{22}** The instructions given here were formulated in compliance with *State v. Lewis*, which requires the jury to be informed that it may "consider both the greater and lesser offenses under a count in any order it deems appropriate provided it returns a verdict of not guilty on the greater offense before the court may accept a verdict on the lesser included offense." 2019-NMSC-001, ¶ 1, 433 P.3d 276. The jury followed the proper order in considering count one and the lesser-included crimes under count one to find Defendant guilty of second-degree murder, armed robbery, and conspiracy to commit armed robbery. Accordingly, the jury delivered a guilty verdict under count one on the lesser-included offense of second-degree murder without separately considering, as instructed, felony murder as the alternative charge to count one.

**{23}** Even so, the jury was properly instructed on the essential elements of each of the crimes Defendant was charged with committing. There is simply no indication that the

jury was confused by the substance of the instructions. Rather, the jury's confusion appears to have been limited to the verdict forms it needed to sign. As the State correctly points out in its briefing, the jury's "return to the jury room was not to begin and end deliberations on the [felony murder] charge, but rather to formalize its verdict." In sum, there was no error, much less fundamental error, in the jury instructions as given.

## III.    CONCLUSION

{24}    We affirm the judgment and sentence.

{25}    **IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**JULIE J. VARGAS, Chief Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**