IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2024

**STATE OF TENNESSEE v. BENJAMIN L. BRADFORD**

**Appeal from the Circuit Court for Gibson County**
**No. 20038   Clayburn Peeples, Judge**

_____

**No. W2022-01632-CCA-R3-CD**

_____

The Defendant, Benjamin L. Bradford, was convicted by a Gibson County Circuit Court jury of first degree premeditated murder, first degree murder in the perpetration of theft, and destroying, tampering, or fabricating evidence. *See* T.C.A. §§ 39-13-202(a)(1)-(2) (first degree murder) (2018) (subsequently amended), 39-16-503 (2018) (destroying, tampering with, or fabricating evidence). The jury imposed a sentence of life without parole for each of the first degree murder convictions and merged the judgments. The trial court imposed a fifteen-year sentence for destroying, tampering, or fabricating evidence, to be served consecutively to the life-without-parole sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Alexander D. Camp (on appeal), and J. Noble Grant, III (at trial), Jackson, Tennessee, for the appellant, Benjamin L. Bradford.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Frederick H. Agee, District Attorney General; and Nina Seiler and Scott Kirk, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to his July 20, 2018 bludgeoning of his sixty-seven-year-old mother, Gwendolyn Hall, in her home. The Defendant initially claimed at the scene that someone "did this and ran off," but he later gave inculpatory statements in which he admitted he had argued with the victim and had physically assaulted her, but he

denied that he had intended to kill her and suggested someone else had inflicted the gash on her head. He denied that their altercation had been about money and that he tried to clean up the scene after he assaulted her, but he admitted that he broke her car window with a baseball bat to search for money in her car.

At the trial, the State's evidence showed that, in the early morning hours of July 20, 2018, Milan Police and emergency personnel responded to the victim's home in response to a 9-1-1 call from the Defendant. The responding officers found the badly injured victim slouched on a couch. Her face was badly swollen, and she had a deep gash over one eye. She was breathing and moaning but was unable to speak. She was not wearing a shirt. The Defendant, who had blood on his hands and was shirtless with a bloody shirt rolled around his neck, was present. The Defendant stated, "Some coward n----- did this and ran off." Officers detained the Defendant. One of the responding officers described the Defendant as "nonchalant" and as not exhibiting remorse. Another responding officer described the Defendant as neither upset nor crying but "talking out of his head." This officer said the Defendant stated he would not talk to any West Tennessee law enforcement officers.

Responding officers testified that a large amount of blood was seen in the living room, hall, and a bedroom of the home. Blood was on the carpet and a bedroom closet door, and a large amount of blood was on the bedroom floor. Dentures were found on the floor and later identified by a family member as belonging to the victim. Other evidence showed that the bedroom was the Defendant's bedroom. A bloody comforter was found in the laundry room. The victim was found shirtless, but her shirt was not found. Luminol examinations were conducted and showed evidence of blood on a recliner in the living room and on sink handles and a towel in the bathroom. No signs of forced entry into the home were found. The passenger-side window of a car parked in the carport was shattered, and a baseball bat lay nearby. The door and the bat both had a substance which appeared to be blood on them. Police body camera video recordings show the interior of the home, which included bloody areas in the living room and a bedroom. The bedding on the bed in the bedroom was in disarray, and no comforter was on the bed.

The victim was transported from the scene by ambulance and later taken by helicopter to a Memphis hospital, where she died the next day. The forensic pathologist who performed the victim's autopsy testified that the victim's cause of death was blunt force head injuries and that the manner of death was homicide. The pathologist stated that the victim had lacerations to the right eye, above the bridge of the nose, on the top of the head, and behind the right ear. The pathologist also observed bruising, lacerations, a contusion, a torn toenail, and bleeding. The pathologist acknowledged that he could not determine the number of blows sustained by the victim, said he found six areas of impact, and agreed it was "possible" the number of blows was as low as three. He said that of the victim's injuries, the brain bleeding was the most lethal. He said that despite the victim's preexisting renal failure, she would not have died in the absence of the blunt force injuries.

-2-

The Defendant gave a written statement on the day he was taken into custody. In this statement, the Defendant said the following: He came home drunk and argued with the victim about the Defendant's relationship with his ex-wife, with whom he had recently reunited. He said he had "snapped" and had hit the victim on both sides of her head. The Defendant left the home but returned and found the victim in the floor with a gash in her forehead. He told her to tell him where her car keys were in order for him to drive her to the emergency room, but she was unable to speak in a manner he could understand. He called 9-1-1. He had not meant to hurt the victim and had snapped.

The Defendant gave a recorded statement three days after the incident. He stated the following: He was at his mother's home, where he stayed and had his own room, on the evening of July 19, 2018. He called his ex-wife and tried to get her to come to the home, and the victim said "crazy s---," in response to which the Defendant "snapped" and hit the victim. The victim tried to grab the Defendant, who grabbed her shirt. The shirt tore and came off. The victim fell into a table in the living room. The Defendant picked her up and hit her again. He grabbed her foot and pulled her into his bedroom. The victim threatened to call the police, and he challenged her to call them. The Defendant left his bedroom and wiped blood from the floor near the refrigerator[1] because he did not want anyone to slip. He placed a comforter in an unspecified location. He washed his hands, went outside, picked up a baseball bat, smashed a car window in an effort to locate money, put down the bat, and went to a store to buy "another drink." He returned fifteen to twenty minutes later and found the victim lying on the floor of his room, the location where she had been when he left. He moved the victim to the living room couch and asked where she kept her keys because he was going to take her to the emergency room. The victim was "talking crazy," and he called 9-1-1. The Defendant repeatedly insisted that he had snapped and had not meant to kill the victim. He acknowledged that he hit her too hard. He said the gash on the victim's face had to have occurred when she fell into the living room table or have been inflicted by an unknown assailant while he was gone. He said that the victim had inserted herself into his business and that he had just wanted to see his ex-wife. He denied that he disposed of any evidence, including the victim's shirt. He repeatedly denied that he had taken the victim's purse, which other evidence showed was unaccounted for at the time of the statement but was later discovered by the Defendant's sister in a laundry basket in the home. He acknowledged that he had looked for money. The Defendant denied that he had taken the bat inside the home and that he had assaulted the victim with the bat. The Defendant acknowledged that he had been using drugs at the time of the incident but declined to identify the person from whom he obtained the drugs.

---

[1] The video evidence shows that the refrigerator was near an open doorway between the living room and the kitchen.

A person who had visited the victim on July 19, 2018, testified that the victim had been upset and had trembled. The person said the victim had stated that she and the Defendant had just fought over his wanting money from her purse, which the victim had refused. The person said the victim stated that the victim had taken her purse from the Defendant and that the Defendant had said he would be back and had left the home.

The victim's daughter testified that the Defendant stayed at the victim's home "off and on." The victim's daughter said she had lived at the home until June 2018 but had moved out because the Defendant was "on drugs" and caused problems for the victim. The victim's daughter said the Defendant took money from the victim for drugs. She described an incident in which she heard screaming and went into the victim's bedroom, where she found the Defendant dumping the victim's purse contents onto a bed and taking money. The victim's daughter said the victim tried to get her purse from the Defendant, but he pushed the victim onto the floor. The victim's daughter said her daughter had to help the victim stand. The victim's daughter said she had gone at the victim's request to the victim's home a few hours before the fatal assault, at which time the victim wore a pajama top. The victim's daughter said she went to the victim's home about a week after the fatal incident. She found the victim's purse underneath clothing in a hamper. She did not find the pajama top the victim had been wearing when she had last seen the victim, despite an extensive search of the home.

An expert witness in DNA analysis and serology testified that the bat collected from the carport contained a DNA mixture of two individuals, with the respective profiles being consistent with the Defendant and the victim.

The Defendant elected not to testify, but he offered an expert in forensic pathology, who testified that he had reviewed the report of and photographs from the victim's autopsy, the victim's medical records, the 9-1-1 report, and the Defendant's statement. He said that the autopsy report did not make clear whether some of the victim's head injuries were due to medical intervention, rather than the assault. He noted the victim's medical history of hypertension and chronic renal disease. He opined that the victim's renal disease would have made her more susceptible to bleeding, although he agreed that the victim's bleeding resulted from blunt force trauma and had not been spontaneous. He said that because the victim was an elderly woman, she likely had some osteoporosis, which would have meant her bones were more susceptible to breakage from trauma. The expert agreed with the State's expert regarding the cause of death being blunt force trauma. He said that, with regard to homicide as the manner of death, the term "homicide" as used in pathology meant the killing of a human by another and did not connote the existence of criminal activity. In his opinion, the victim had three or four blunt force injuries.

The jury found the Defendant guilty of first degree premeditated murder, first degree murder in the perpetration of theft, and tampering with evidence. In a bifurcated

proceeding, the jury found that the Defendant should be sentenced to life without parole. The trial court merged the first degree murder convictions into a single judgment of conviction, and it imposed a fifteen-year sentence for the tampering with evidence conviction to be served consecutively to the life-without-parole sentence. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. The State responds that the evidence is sufficient. We agree with the State as to the murder convictions but agree with the Defendant as to the tampering with evidence conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

# I

## First Degree Murder

### A. First Degree Premeditated Murder

The Defendant argues that the State failed to present sufficient evidence to support the jury's finding of premeditation. He argues that the State did not offer evidence that he procured or used a deadly weapon, that he planned or declared an intent to kill the victim, that he made efforts to conceal the crime after committing it, or that he destroyed or concealed evidence after the killing.

As relevant here, [f]irst degree murder is . . . [a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1) (2018) (subsequently amended).

In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "[A] defendant's conscious objective need not be to kill a specific victim." *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999). However, the evidence must establish that a defendant had the "conscious objective to kill a person," meaning that a "defendant intended to cause . . . the death of a person." *Id.* A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

[D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

Viewed in the light most favorable to the State, the evidence shows that the victim told a visitor to her home that she and the Defendant fought over the victim's purse on June 19, 2018, that she had recovered the purse from him, and that he had left the home and stated he would return. Although the Defendant claimed that the disagreement he later had with the victim was about her interference with his relationship with his ex-wife, the circumstantial evidence of an earlier altercation over money and the Defendant's statement that he would return suggests otherwise. By his own admission, the Defendant assaulted the victim, and the evidence at the scene established that a sustained, violent attack occurred. No evidence suggested that the elderly victim was armed. The victim suffered numerous injuries to her body, including three or more blows to the head and face. The victim died from blunt force trauma, and the photographs of her injuries depict violent, significant injuries. The Defendant admitted that he had broken the car window and had looked for money in the car after assaulting the victim and before he left the home. The victim was shirtless when the police arrived, and her shirt was not recovered. The Defendant acknowledged washing his hands and cleaning unspecified areas of the home after he assaulted the victim. Despite having badly injured the victim, he left the home for some period of time before eventually returning and calling the authorities. He initially blamed an unknown assailant for the gash on the victim's face. The Defendant did not appear upset and, instead, appeared nonchalant and unremorseful when the authorities arrived. The Defendant admitted that he had hit the victim multiple times and had dragged her by her foot from the living room to his bedroom. Although he denied that he intended to kill the victim, he said he had snapped and acknowledged that he had hit her too hard. Despite his denials of having hit the victim with the baseball bat, responding officers observed a substance that appeared to be blood on the bat, and forensic testing showed that the Defendant's and the victim's DNA were on the bat. No signs of forced entry, which might suggest an unknown assailant, were observed. A large quantity of blood was found in the victim's home, and blood spatter appeared on the floor and the closet door of the Defendant's bedroom.

From the foregoing evidence, a rational jury could conclude beyond a reasonable doubt that the Defendant committed a premeditated killing of the victim. The killing was particularly cruel, with the unarmed victim sustaining a prolonged attack involving multiple blows before being left to suffer while the Defendant searched for money in the victim's car and left the home. The photographs of the scene and of the victim's injuries

demonstrate that a violent attack occurred. The Defendant did not exhibit distress in the immediate aftermath of his crimes, despite the fact that he had just violently assaulted his mother. The evidence is sufficient to support the Defendant's conviction for first degree premeditated murder. The Defendant is not entitled to relief on this basis.

## B. First Degree Murder in the Perpetration of a Theft

The Defendant argues that his conviction for first degree murder in the perpetration of a theft cannot stand because the theft or attempted theft of the victim's purse was a misdemeanor and cannot qualify as a predicate offense under the so-called felony murder statute. He argues, as well, that no theft of the purse was shown. Further, he argues that any attempt to take the victim's purse was not connected "in time, place and continuity of action" with the killing, such that the theft or attempted theft was "in perpetration" of the killing.

As relevant here, "[f]irst degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" *Id.* at (a)(2). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a) (2018).

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

*Id.* § 39-12-101(a), (b) (2018).

We begin with the Defendant's argument that he cannot be convicted of first degree murder in the perpetration of theft because the predicate offense of theft would not constitute a felony on these facts. We acknowledge that this statute is often referred to colloquially as the "felony murder" statute. The relevant statute criminalizes "the killing of another committed in the perpetration of or attempt to perpetrate *any . . .* theft." *See* T.C.A. § 39-13-202(a)(2) (emphasis added). As other panels of this court have explained, the statute's predicate offenses include theft, an offense which can be a felony or a misdemeanor. *See State v. Roger Eugene Daly*, No. M2010-00535-CCA-R3-CD, 2011 WL 2418829, at *13-14 (Tenn. Crim. App. June 10, 2011); *see also State v. Leon Flannel*, No. W2007-00678-CCA-R3-CD, 2008 WL 4613829, at *7-8 (Tenn. Crim. App. Oct. 13, 2008), *perm. app. denied* (Tenn. Mar. 23, 2009). "When the text of a statute is clear and unambiguous, we need not look beyond the plain language of the statute to ascertain its meaning." *State v. Welch*, 595 S.W.3d 615, 623 (Tenn. 2020). The statute clearly states that "any . . . theft" is a qualifying predicate offense for first degree murder. *See* T.C.A. § 39-13-202(a)(2). We will apply the plain meaning of the statute in evaluating the sufficiency of the evidence to support the Defendant's conviction of first degree murder in the perpetration of theft.

Viewed in the light most favorable to the State, the evidence shows that on the day before the Defendant's 9-1-1 call about the victim's injuries, the victim told a visitor that she and the Defendant had fought over her purse and that he had left the home after she took the purse from him and had promised that he would return. The Defendant's sister testified that she had lived with the victim until the month before the incident but that she had moved out because of the Defendant's drug use. She said the Defendant fought with the victim about money for drugs, and the Defendant's sister had witnessed an incident in which the Defendant had shaken contents from the victim's purse and had pushed the victim to the floor when the victim tried to get her purse. The Defendant admitted in his pretrial statement that he had been using drugs when he snapped, fatally assaulting the victim. The victim's purse was later recovered from a location that suggests from circumstantial evidence that it had been hidden after the earlier incident the victim reported to the visitor. After savagely assaulting the victim, the Defendant smashed the victim's car window with a baseball bat and searched for money in the car before leaving the home. From this evidence, a rational jury could conclude beyond a reasonable doubt that the Defendant was attempting to commit a theft of money from the victim when he committed the assault which cause her death. The evidence is sufficient to support the Defendant's conviction for first degree murder in the perpetration of theft.

In reaching this conclusion, we have considered the Defendant's argument that any theft or attempted theft was too attenuated in time from the assault to form the predicate offense for first degree murder in the perpetration of theft. The Defendant's argument relies on the earlier incident reported by the victim to a visitor as the predicate offense and

overlooks the Defendant's admission that he snapped and assaulted the victim, after which he smashed the victim's car window and searched for money. The circumstantial evidence supports an inference, as well, that the altercation occurred not because of a purported conflict about the Defendant's marital relationship, but because of the Defendant's desire to take money from the victim after she thwarted his earlier efforts. The evidence demonstrates that the Defendant's intent to commit a theft "exist[ed] prior to or concurrent with the commission of the act causing the death of the victim." *See State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999). The Defendant is not entitled to relief on this basis.

## II

### Altering, Destroying, or Fabricating Evidence

The Defendant argues that the evidence is insufficient to support his conviction for altering, destroying, or fabricating evidence. The relevant statute provides: "It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]" T.C.A. § 39-16-503(a)(1) (2018).

Our supreme court has said the proscriptive statute requires proof of three things: timing, action, and intent. *See State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013). Relative to timing, the evidence must establish that the defendant acted with regard to the evidence with knowledge "that investigation or official proceeding is pending or in progress." *See* T.C.A. § 39-16-503(a)(1); *Hawkins*, 406 S.W.3d at 132. A "pending" investigation means one which is "impending." *State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014). "Action" is shown by a defendant's altering, destroying, or concealing evidence. *Hawkins*, 406 S.W.3d at 132. "Intent" requires that the defendant's action relative to the evidence in question was undertaken "'with the intent to impair its verity, legibility, or availability as evidence.'" *Id.* (quoting T.C.A. § 39-16-503(a)(1)).

Viewed in the light most favorable to the State, the evidence shows that the victim wore a pajama shirt when her daughter visited her home in the hours before the fatal incident. The Defendant said in his recorded statement that the victim's shirt had torn and come off during their altercation. The shirt was not recovered by the authorities, and the victim's daughter thoroughly searched the home after the crimes but did not find the shirt. In addition, the Defendant admitted that he had washed his hands after assaulting the victim, and Luminol examination showed the presence of blood on a living room chair and the sink knobs and a towel in the bathroom. The Defendant also admitted that he had wiped up blood from the floor inside the home. He said, as well, that he moved the victim from his bedroom to the living room couch and that he placed a comforter in the laundry room. The evidence shows that the Defendant's efforts to clean his hands and bloody surfaces in

the home occurred after he violently assaulted the victim and before he eventually summoned help for the victim. When the authorities arrived, he claimed an unidentified third person had assaulted the victim while he had been elsewhere.

Regarding the timing element, the evidence viewed in the light most favorable to the State shows that the Defendant cleaned his hands and surfaces in the home when the Defendant would have known that, as a result of his assault of the victim, an investigation was impending. *See Smith*, 436 S.W.3d at 763. "Impend" means "to hover threateningly" and "to be about to occur." *Merriam-Webster's Collegiate Dictionary* (10th ed.). That the Defendant undertook the actions before calling 9-1-1 is not determinative of whether an investigation is impending. *See Smith*, 436 S.W.3d at 765 (evidence was sufficient to support a conviction for fabricating evidence where the defendant knew an investigation was "impending" when he moved the victim's car to a remote location before calling 9-1-1); *State v. Sadegh Babanzadeh*, No. M2017-02235-CCA-R3-CD, 2019 WL 102108, at *5 (Tenn. Crim. App. Jan. 4, 2019) (evidence was sufficient to support tampering with evidence conviction where the defendant conducted internet research about how to treat the victim's heroin overdose, told another person not to call 9-1-1 for medical help for the victim, and cleaning up the apartment before he eventually called 9-1-1). Likewise, the evidence showed that the Defendant took action. *See Smith*, 436 S.W.3d at 763. By the Defendant's own account, he washed his hands and cleaned surfaces in the home after assaulting the victim. He also removed a comforter from the bedroom where the assault occurred and moved the victim from a bedroom and placed her on the living room couch. The evidence also showed circumstantially that the Defendant intended to impair the integrity of the scene before he called 9-1-1 to get help for the victim. *See id.*

The evidence is sufficient to support the Defendant's conviction for altering, destroying, or fabricating evidence. *Cf. Clark v. Commonweath*, 567 S.W.3d 565, 569-70 (Ky. 2019) (holding that the evidence of tampering with evidence was sufficient under a statute similar to Tennessee's where the defendant moved the victim's body after the shooting, the scene showed evidence that blood had been wiped from surfaces, and the defendant asked to wash his hands when the homeowner arrived at the scene). In reaching this conclusion, we assign no weight to the victim's missing shirt. Although the victim was found shirtless and the shirt was not found in the searches conducted by law enforcement and the victim's daughter, no evidence showed that the Defendant took any action to destroy it or conceal it in order to frustrate the investigation. *Cf. State v. Duran*, 140 P.3d 515, 521 (N.M. 2006) (holding that the evidence was insufficient to support the defendant's tampering with evidence conviction where "no evidence of an overt act to destroy or hide" evidence of the crime was offered).

In consideration of the foregoing and the record as a whole, the judgments are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE