# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 8, 2016

**NO. 34,143**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**RHIANNON MONTOYA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Mary L. Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VANZI, Judge.**

{1}     Following the brutal murder of her uncle, Rudy Montoya, by two of her friends, Angel Baldonado and Sheanee Martinez, a jury acquitted Defendant Rhiannon Montoya of first degree murder but found her guilty of aggravated burglary and tampering with evidence. Defendant now challenges these convictions arguing that (1) the district court impermissibly prohibited defense counsel from expounding on the definition of "reasonable doubt" during closing argument, (2) her convictions violate double jeopardy because they are based on unitary conduct, and (3) the State failed to present evidence sufficient to establish her guilt. We affirm.

**BACKGROUND**

{2}     Sometime in the late evening of October 10, 2012, or early morning hours of October 11, 2012, Rudy and Jose Montoya, Rudy's then 98-year-old father, were at their home in Chimayo, New Mexico. Jose was asleep in his room. Baldonado and Martinez went to Rudy's and Jose's home and knocked on the back door. Rudy answered and Baldonado asked if he had jumper cables. Rudy told them that he did not have any, and Baldonado then asked if they could use his telephone to call someone for help. Rudy agreed and invited them in his home because it was cold

outside. Minutes later, Rudy lay dead on the floor of his laundry room; he had suffered forty-eight stab wounds and multiple hits to the head by a baseball bat.

{3} On the morning of October 12, 2012, Rudy's neighbor, who was delivering breakfast to Jose as he did every Friday, discovered Rudy's body in a pool of blood in the laundry room. Jose, who was hard of hearing and seeing due to his advanced age, had not yet realized what had happened to his son. Jose died several months later.

{4} At trial, Baldonado and Martinez admitted to killing Rudy but gave different testimony as to their motives. Baldonado, who was twenty-two years old at the time of the incident, testified that on the night of the murder, Defendant offered her and Martinez, then eighteen years old, $10,000 each and some land if the two would kill her uncle, Rudy. According to Baldonado, Defendant wanted Rudy dead because she believed she would then get a larger inheritance upon Jose's death. Baldonado testified that she and Martinez agreed to kill Rudy, at which point Defendant gave Martinez a knife to use as the murder weapon and drove them to Rudy's house.

{5} Martinez likewise testified that, on the night of the murder, Defendant offered her money to kill Rudy. Martinez did not take this offer seriously, however, and never agreed to do it. Rather, because she was a heroin addict and needed money to alleviate her withdrawal symptoms, Martinez said that she "was down to go do a

2

residential [burglary]." Defendant then told Martinez that her uncle had a television set that she could sell and drove Baldonado and Martinez to his house. As to the knife, Martinez testified that earlier in the evening, Defendant had handed the knife to her, that she was playing with it, and then put the knife in her pocket because she wanted to steal it from Defendant and sell it.

{6}     Both Baldonado and Martinez testified that when they arrived at Rudy's house, Baldonado took a baseball bat from the trunk of the car, and she and Martinez went to the back door while Defendant waited in the vehicle. As soon as Rudy let them into his home to use his telephone, Baldonado attacked him with the baseball bat. When Rudy tried to defend himself, Martinez pulled out the knife and stabbed him twice. Martinez then gave the knife to Baldonado, who blacked out and proceeded to stab Rudy over forty times. According to the medical evidence presented at trial, some of the stab wounds had possibly been inflicted even after Rudy had died.

{7}     Panicked, Baldonado and Martinez ran back to the car without taking anything from the home. When they told Defendant what had happened, Defendant said that they had to go back in order to make the crime look like a robbery rather than a murder. While Baldonado and Martinez gave different testimony as to the sequence of subsequent events, both testified that, at some point, they went to Defendant's home, where Baldonado changed clothes and took a shower, and Martinez cleaned

Rudy's blood off of the knife and her shoes. They further testified that they later went back to Rudy's house and stole various electronics and other property, including Jose's car. They hid most of the stolen property at Baldonado's parents' house and sold Rudy's television to Baldonado's father. Baldonado and Martinez eventually took Jose's car to Defendant's home, at which point Defendant became angry and told them that they had to get rid of it. Baldonado and Martinez hid Jose's vehicle on the side of the road in Lyden, New Mexico and went back to Defendant's home where they spent the rest of the night drinking.

{8}     The next morning, Defendant and Martinez left in Baldonado's car to pick up drugs and were pulled over and ultimately arrested on unrelated matters. During the attendant search of the vehicle, the police found a bag containing Baldonado's bloody clothes and the baseball bat, as well as some of Rudy's property. Later that evening, Baldonado took the remaining stolen property from her parents' home to a friend's house and hid it there.

{9}     The next day, Baldonado learned that Rudy's death had been discovered. Baldonado then picked up gasoline from her parents' home and set Jose's car on fire. This caused an explosion, and Baldonado suffered severe burns to her arms and face. She was taken to the hospital by ambulance. Around the same time, Martinez, who

was in jail, confessed to the murder. Baldonado was questioned at the hospital and likewise confessed.

{10}	Baldonado and Martinez both pleaded guilty to second degree murder, burglary, and tampering with evidence. At the close of Defendant's trial, the jury was instructed on felony murder, aggravated burglary, and tampering with evidence. The jury found Defendant not guilty of felony murder but guilty of aggravated burglary and tampering with evidence. This appeal followed.

## DISCUSSION

### Defining the Reasonable Doubt Standard

{11}	Defendant's first argument on appeal is that the district court erred in prohibiting defense counsel from explaining the reasonable doubt standard to the jury during his closing argument. Our review of the record reveals that, when defense counsel addressed the State's burden of proof toward the end of his lengthy closing argument, defense counsel was allowed to discuss the two lower civil standards of proof (beyond a preponderance of the evidence and clear and convincing evidence), as examples of the types of cases in which each of these lower standards are used, and to contrast them with the criminal standard. Next, defense counsel stated,

> Then you have the criminal law standard, which is even higher than clear and convincing. It is the highest burden in our criminal justice system. Higher than proof required to take somebody's child away. You

5

can't quantify it. It's different for every person. But I've heard a couple [of] people who are smarter than me try to put it into words, so I will hopefully try to explain what it means.

{12} At this point, the State interrupted and asked the district court for the definition of "reasonable doubt" contained in UJI 14-5060 NMRA. The court responded, "We are going to just stand by this definition instead of other people's," adding that the jury must follow the instruction they had been given. Defense counsel then read that definition[1] to the jury and gave the example of open heart surgery as "a pretty grave and important affair in [one's] life."

{13} He then proceeded, saying, "Imagine, you go to a doctor . . . " At this point the court interrupted and asked counsel to approach the bench. Outside of the hearing of the jury, the court ordered defense counsel to "[l]eave the jury instruction as it is[.]" Defense counsel insisted that "this is argument and I am entitled to do argument[,]" but the court disagreed and told counsel "to follow [the court's] order." After being held in contempt for saying "[t]his [c]ourt can't run how I want to make argument[,]" counsel then proceeded to argue that the inconsistencies in the co-defendants' testimonies and the lack of any physical evidence tying Defendant to the crimes meant that the State had failed to meet its burden of proof.

---

[1]"A reasonable doubt is a doubt based on reason and common sense[—t]he kind of doubt that would make a reasonable person hesitate to act in the graver and more important things in life."

{14} This Court has recognized that, while "[f]inal summation is basic to the right of a defendant in a criminal trial to make his defense[, t]his right is not . . . without limitation." *State v. Fish*, 1985-NMCA-036, ¶ 24, 102 N.M. 775, 701 P.2d 374 (citation omitted). Rather, "a trial court has wide discretion in dealing with and controlling counsel's argument to the jury and, if no abuse of this discretion or prejudice to [the] defendant is evident, error does not result." *State v. Pace*, 1969-NMSC-055, ¶ 21, 80 N.M. 364, 456 P.2d 197. Defendant asserts that, by prohibiting defense counsel "from explaining what the beyond a reasonable doubt standard means," the district court abused its discretion and violated her right to due process and a fair trial.

{15} The State contends that Defendant failed to preserve this issue for appellate review because "[a]t no time did defense counsel argue that Defendant would be denied a fair trial if counsel were not allowed to further discuss the definition of reasonable doubt." "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked, but formal exceptions are not required[.]" Rule 12-216(A) NMRA.

> The primary purposes of the preservation requirements are: (1) to specifically alert the district court to a claim of error so that the error may be corrected at that time, (2) to allow the opposing party adequate opportunity to respond to a claim of error, and (3) to create a sufficient record to allow this Court to make an informed decision regarding the contested issue.

*State v. Moncayo*, 2012-NMCA-066, ¶ 5, 284 P.3d 423. Our review of the record indicates that each of these purposes was served in this case. Defense counsel objected to the district court's order, stating, "this is argument and I am entitled to do argument[,]" but the district court disagreed. Given the district court's position, the State had no need to respond, and the record is sufficient for this Court to make an informed decision. Therefore, we hold that the issue was preserved.

{16} We further hold that the district court did not abuse its discretion in prohibiting defense counsel from deviating from the definition of "reasonable doubt" contained in UJI 14-5060. *See Pace*, 1969-NMSC-055, ¶ 21 (noting that the district court "has wide discretion in dealing with and controlling counsel's argument to the jury"). As the United States Supreme Court has held, "[t]he beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). If a definition is provided, however, that definition must be carefully worded, as an erroneous instruction regarding the state's burden of proof is always prejudicial error. *See Sullivan v. Louisiana*, 508 U.S. 275, 280-82 (1993). In New Mexico, this careful wording is provided in UJI 14-5060. Our Supreme Court has held that "UJI 14-5060 adequately expresses [the] definition [of 'beyond a reasonable doubt'] and is to be used in all jury trials, unadorned by any

added, illustrative language." *State v. Garcia*, 2005-NMSC-017, ¶ 10, 138 N.M. 1, 116 P.3d 72. The extent to which parties, as opposed to the courts, may deviate from this definition in addressing the jury is an issue of first impression; however, as the State correctly points out, if our district courts are not permitted to vary the language of the definition, certainly parties must be similarly limited. *See id.*; *see also State v. Harnois*, 638 A.2d 532, 535 (R.I. 1994) ("We take this opportunity to declare specifically that only the court has the authority and the responsibility to define 'reasonable doubt' and any other rule of law. Many jurisdictions have addressed this specific issue and have held that trial attorneys are not permitted to define 'reasonable doubt' to juries."). Therefore, we hold that the district court did not abuse its discretion in prohibiting defense counsel from discussing before the jury the definition of "reasonable doubt" formulated by "a couple of people who are smarter than [defense counsel]" and from providing a hypothetical example involving a visit to the doctor. *See, e.g.*, *United States v. Williams*, 526 F.3d 1312, 1320 (11th Cir. 2008) (holding that defense counsel's comparison of reasonable doubt "to a patient's desire to seek a second opinion when told by a doctor 'you know, I'm looking at you and I think you need to have both of your legs amputated' " was both inaccurate and confusing); *People v. Nguyen*, 40 Cal. App. 4th 28, 36 (1995) ("We strongly disapprove of arguments suggesting the reasonable doubt standard is used in daily life

to decide such questions as whether to change lanes or marry."); *Evans v. State*, 28 P.3d 498, 514 (Nev. 2001) ("This court has repeatedly cautioned the district courts and attorneys not to attempt to quantify, supplement, or clarify the statutorily prescribed standard for reasonable doubt. . . . [T]he defense bar and prosecutors alike [are] not to explain, elaborate on, or offer analogies or examples based on the statutory definition of reasonable doubt.").

{17}  Here, the jury was properly instructed pursuant to UJI 14-5060. Contrary to Defendant's assertion on appeal, defense counsel was not prevented from pursuing a viable defense strategy or making proper argument during summation. *See Williams*, 526 F.3d at 1320 ("Defense counsel is entitled to apply the accepted definition of reasonable doubt to the facts of the case."); *Seckington v. Florida*, 424 So. 2d 194, 195 (Fla. Dist. Ct. App. 1983) ("Even though it is not the prerogative of an attorney in his closing arguments to instruct the jury on the law, it is entirely appropriate for an attorney to relate the applicable law to the facts of the case."); *People v. Laugharn*, 698 N.E.2d 219, 222 (Ill. App. Ct. 1998) ("[B]oth the prosecutor and defense counsel are entitled to discuss reasonable doubt and to present his or her view of the evidence and to suggest whether the evidence supports reasonable doubt."); *Evans*, 28 P.3d at 514 ("Counsel may argue that evidence and theories in the case before the jury either amount to or fall short of [the] definition [of reasonable doubt]—nothing more."). We

conclude that the jury was properly instructed on the definition of "reasonable doubt." Indeed, upon completion of the bench conference, defense counsel proceeded to argue that the State had failed to meet its burden of proof. Finding no error, and consistent with the holdings in other jurisdictions that attorneys are not permitted to pose different definitions of "reasonable doubt," we hold that the district court did not abuse its discretion.

**Double Jeopardy**

{18}    Defendant further argues that her convictions for aggravated burglary and tampering with evidence violate double jeopardy. We review the issue de novo. *State v. Bernal*, 2006-NMSC-050, ¶ 6, 140 N.M. 644, 146 P.3d 289. Principles of double jeopardy protect against both successive prosecutions and multiple punishments for the same offense. *Swafford v. State*, 1991-NMSC-043, ¶ 6, 112 N.M. 3, 810 P.2d 1223. Defendant challenges her convictions based on the latter, arguing that hers is a double-description case in which a single act resulted in two convictions under different statutes. *See id.* ¶ 9.

{19}    When reviewing double-description claims, we follow the well established two-step analysis. First, we analyze the factual question, "whether the conduct underlying the offenses is unitary, *i.e.*, whether the same conduct violates both statutes." *Id.* ¶ 25. If we answer this first question in the affirmative, we then consider

11

"whether the [L]egislature intended to create separately punishable offenses." *Id.* On the other hand, "if the conduct is separate and distinct, [the] inquiry is at an end." *Id.* ¶ 28.

{20}    Defendant argues that "[t]he conduct underlying the aggravated burglary—entering [Rudy's home] while armed with a knife with the intent to commit a theft—and the conduct underlying the tampering—removing items from [Rudy's] home—are the same." However, the record on appeal does not support Defendant's assertion that her tampering with evidence conviction was based on the *theft* or *removal* of Rudy's property from his house. Rather, the jury found Defendant guilty of tampering with evidence as an accomplice for having "destroyed[] or hid a microwave, a laptop computer, tools, a television, an all in one printer/fax machine, and other belongings of Rudy . . . ; or cleaned the knife used to kill Rudy[.]" The acts of destroying or hiding stolen property after it has been stolen, or cleaning the victim's blood off of the murder weapon after the murder, are each separate and distinct from the conduct of entering a home armed with said weapon with the intent to steal said property. *State v. Mora*, 2003-NMCA-072, ¶ 18, 133 N.M. 746, 69 P.3d 256 ("[W]e will find that conduct is not unitary when the illegal acts are separated by sufficient indicia of distinctness." (internal quotation marks and citation omitted)).

12

{21} In addition, conduct is generally not unitary when there is "an identifiable point at which one of the charged crimes ha[s] been completed and the other not yet committed." *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61. The offense of aggravated burglary is complete upon unauthorized entry, with the requisite intent, while armed with a deadly weapon. *See State v. Montoya*, 2011-NMCA-074, ¶ 34, 150 N.M. 415, 259 P.3d 820. Rudy's property, which was taken from within his house, could not have been hidden or destroyed, and the knife used to kill him within his house could not have been cleaned of his blood, until after the aggravated burglary was completed. Therefore, Defendant's convictions were not premised on unitary conduct, and no double jeopardy violation occurred. *Swafford*, 1991-NMSC-043, ¶ 28 ("[I]f the conduct is separate and distinct, [the] inquiry is at an end.").

**Sufficiency of the Evidence**

{22} Defendant's final challenge on appeal is to the sufficiency of the evidence presented by the State in support of her two convictions. "The test for sufficiency of the evidence is whether substantial evidence of either direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). In applying this test,

13

we "view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict, while at the same time asking whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citations omitted).

{23}     With regard to aggravated burglary, Defendant does not challenge a specific element of her conviction as unsupported by substantial evidence. Rather, Defendant argues that her conviction should be reversed because it was "based almost entirely on the testimony of co-defendants Angel Baldonado and Sheanee Martinez." Defendant's argument appears to be that such testimony, when uncorroborated by physical evidence, is insufficient as a matter of law.

{24}     Contrary to Defendant's position, our Supreme Court has held that "[t]he uncorroborated testimony of an accomplice is sufficient in law to support a verdict." *State v. Kidd*, 1929-NMSC-025, ¶ 3, 34 N.M. 84, 278 P. 214; *see State v. Gutierrez*, 1965-NMSC-143, ¶ 4, 75 N.M. 580, 408 P.2d 503 ("[T]he rule in this jurisdiction is that a defendant may be convicted on the uncorroborated testimony of an accomplice."); *State v. Armijo*, 1931-NMSC-008, ¶ 30, 35 N.M. 533, 2 P.2d 1075 ("Ordinarily, when an eyewitness has testified to the crime and has identified the accused, an appellate court is powerless to interfere with a verdict of guilty. The rule

is not varied by the fact that the witness was an accomplice."). This Court has likewise stated that, "[i]n New Mexico, a defendant may be convicted on the uncorroborated testimony of an accomplice." *State v. Maes*, 1970-NMCA-053, ¶ 24, 81 N.M. 550, 469 P.2d 529. Defendant fails to address this binding precedent in her briefs, and we refuse to depart from it.

{25}    With regard to Defendant's tampering with evidence conviction, the jury was instructed that, in order to convict Defendant as an accomplice, it had to find that (1) "[D]efendant intended that the crime be committed"; (2) "[t]he crime was committed"; and (3) "[D]efendant help[ed], encouraged, or caused the crime to be committed." Defendant acknowledges that Baldonado and Martinez each committed tampering by disposing of Rudy's property and cleaning his blood off of the murder weapon, respectively, but argues that neither of them "implicated [Defendant] as an accomplice to these acts."

{26}    Where an element is charged in the alternative, a conviction under a general verdict, as in this case, will stand so long as at least one of the alternative theories of guilt is supported by sufficient evidence. *See State v. Olguin*, 1995-NMSC-077, ¶ 2, 120 N.M. 740, 906 P.2d 731. We hold that the State presented sufficient evidence from which a rational jury could infer that Defendant both intended Martinez to tamper with evidence by cleaning the murder weapon and helped her do so. Both

15

Baldonado and Martinez testified that the knife used to kill Rudy belonged to Defendant, and after Defendant learned that Rudy had been killed, Defendant let Baldonado and Martinez in her house and allowed Baldonado to take a shower and change out of her bloody clothes. Martinez further testified that she cleaned Rudy's blood off of Defendant's knife in Defendant's restroom and in Defendant's presence. After her arrest, Martinez called her father from jail and told him that she had used bleach to clean the knife, and this conversation was played for the jury. Lastly, the officer who searched Defendant's house on October 18, 2012, testified that he noticed a very strong smell of bleach, and there was no testimony that Martinez obtained bleach from somewhere other than Defendant's home. This evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that Defendant intended the destruction of evidence, including the removal of Rudy's blood from her knife, in order to avoid being prosecuted for his murder. *State v. Hoeffel*, 1991-NMCA-070, ¶ 14, 112 N.M. 358, 815 P.2d 654 ("Intent can be proved by circumstantial evidence."). The evidence is likewise sufficient for a rational jury to conclude that Defendant helped Martinez clean the knife by providing Martinez with space and chemicals to do so. Therefore, we affirm Defendant's convictions.

**CONCLUSION**

{27}    For the foregoing reasons, we affirm Defendant's convictions of aggravated burglary and tampering with evidence.

{28}    **IT IS SO ORDERED.**


_____

**LINDA M. VANZI, Judge**

**WE CONCUR:**


_____

**JONATHAN B. SUTIN, Judge**


_____

**M. MONICA ZAMORA, Judge**