This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-42325**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**DOMINIC J. RODRIGUEZ**
**a/k/a DOMINIC RODRIGUEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Court Judge**

Raúl Torrez, Attorney General
Benjamin L. Lammons, Assistant Solicitor General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Jasmine J. Solomon, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**DUFFY, Judge.**

**{1}** Defendant Dominic Rodriguez was convicted of two counts of criminal sexual penetration of a minor (child age thirteen to eighteen), contrary to NMSA 1978, Section 30-9-11(E)(1) (2009), and one count of criminal sexual contact of a minor, contrary to NMSA 1978, Section 30-9-13(D)(1) (2003). On appeal, Defendant argues that his convictions should be reversed due to (1) error in the admission of evidence, (2) prosecutorial misconduct, and (3) the cumulative impact of those errors. We affirm.

**DISCUSSION**

**I.      Underwear and DNA Evidence**

**{2}**      Defendant challenges the admission of "underwear evidence" at trial, which Defendant identifies as a pair of underwear that police collected from the bedroom shared by fourteen-year-old Victim and her sister, A.R., as well as DNA evidence collected from the underwear. Defendant asserts the district court erred in admitting the underwear evidence because (1) the State failed to establish that Victim wore the underwear or that it had any connection to the charges against Defendant, and (2) even if the underwear was relevant, the probative value of the male DNA found on the underwear was substantially outweighed by its prejudicial effect. Defendant objected to the admission of this evidence and there is no dispute that Defendant's claims of error were preserved.

**{3}**      "We review improperly admitted evidence for non-constitutional harmless error." *State v. Serna*, 2013-NMSC-033, ¶ 22, 305 P.3d 936. Under this standard, even if we assume that the district court erred in admitting the underwear evidence (a matter we expressly do not decide), "[a]n erroneous evidentiary ruling is not grounds for a new trial unless the error was prejudicial rather than harmless." *State v. Salazar*, 2023-NMCA-026, ¶ 19, 527 P.3d 693 (internal quotation marks and citation omitted). This requires the Court to evaluate "whether there is a reasonable probability that the error affected the verdict." *State v. Astorga*, 2015-NMSC-007, ¶ 43, 343 P.3d 1245. When examining the likely effect of the error, we "evaluate all of the circumstances surrounding the error." *State v. Tollardo*, 2012-NMSC-008, ¶ 43, 275 P.3d 110. This includes (1) "an examination of the source of the error and the emphasis placed upon the error," (2) "evidence of a defendant's guilt separate from the error," (3) "the importance of the erroneously admitted evidence in the prosecution's case," and (4) "whether the error was cumulative or instead introduced new facts." *Id.* (alterations, internal quotation marks, and citation omitted). "[The d]efendant bears the initial burden of demonstrating that [they were] prejudiced by the error." *Astorga*, 2015-NMSC-007, ¶ 43.

**{4}**      At trial, the State sought admission of the underwear during its direct examination of Officer Larry Reuter, who testified briefly about collecting the underwear as evidence. The State had also elicited testimony from Victim wherein she described that she was wearing black or dark blue underwear, and that she put them in the hamper or just left them in the bedroom. During cross-examination, defense counsel asked Victim about the underwear police had collected from the room, and Victim acknowledged those were the "wrong" underwear because the underwear that police had collected belonged not to Victim but to her sister, A.R. After the State rested, the defense called A.R. to testify, and she confirmed that the underwear collected by the police were hers.

**{5}**      As for the DNA evidence, the State called Jennifer Otto as an expert in DNA forensic analysis. Ms. Otto testified about the process of DNA testing generally before discussing the tests performed on underwear and the results she obtained, which were

that male DNA was present on the underwear, but the quantity was insufficient to move forward with further testing.

**{6}** During the remainder of trial, neither side placed much emphasis on the underwear evidence. Apart from the minimal testimony discussed above, which occupied only about ten minutes of the four-day trial, the prosecution and the defense both briefly discussed the underwear during closing arguments. The State summarized for the jury that although A.R. testified the underwear were hers, she also testified that she was not sexually active and therefore, there was no reason male DNA should be on the underwear. But because there *was* male DNA on the underwear, and because the underwear matched the description Victim gave to the SANE nurse, it was possible that Victim could have been wearing them. Defense counsel responded by arguing that the fact that the State had the wrong underwear highlighted problems with the investigation. All told, the underwear evidence was discussed for less than two minutes during closing. On the whole, we see no indication that the State exploited the evidence, "nor did it make the evidence a significant part of its case against Defendant." *See State v. Serna*, 2013-NMSC-033, ¶ 25, 305 P.3d 936.

**{7}** The other evidence of Defendant's guilt was compelling. In addition to Victim's testimony about the events, the jury was presented with evidence of Defendant's DNA on Victim's body and physical injuries to Victim's genitals. Swabs taken from Victim's mons pubis/outer labia majora tested positive for both male DNA and for saliva. Defendant could not be eliminated as a source of the male DNA found on Victim's genitals. DNA found on Victim's breast swabs matched Defendant's DNA profile. The jury was also shown Victim's SANE exam report and heard testimony from the SANE detailing the physical injuries to Victim's genitals. The State introduced photos of Victim's injuries that were taken during the SANE exam, which occurred about three days after the assault. The State also elicited testimony from Victim's boyfriend, a school counselor, and a forensic interviewer regarding Victim's demeanor following the assault, as well as testimony showing that Victim's narrative remained consistent. Finally, the State admitted into evidence a video of Defendant's police interview, wherein Defendant stated that if Victim said he assaulted her, he believed his daughter "one-hundred percent."

**{8}** In light of the evidence above, which confirmed the presence of Defendant's DNA on Victim's body, the underwear evidence was largely unnecessary to the State's case. The underwear itself did not clearly belong to Victim, and the DNA evidence taken from the underwear was insufficient in quantity to identify anyone as the source. While Defendant asserts that the State argued the significance of the underwear in closing arguments, the prosecutor conceded that Defendant's DNA was likely to be everywhere given that he lived in the house—including on Victim's clothing—and told the jury that whether Victim or A.R. owned or wore the underwear "really doesn't matter. What matters is the DNA that was found on [Victim], because it's just male DNA [on the underwear]." The State urged the jury to rely on evidence of Victim's genital injuries, DNA and saliva results from swabs taken from Victim's body, Victim's testimony, and the testimony regarding Victim's demeanor following the incident.

**{9}** Finally, we are not persuaded that the underwear evidence introduced new facts at trial. Defendant argues that the underwear evidence either (1) "corroborated the presence of male DNA tied to" Victim's genitals, or (2) introduced the idea that A.R.'s underwear had male DNA on it. As for Defendant's first alternative, if the jury believed that the underwear was Victim's (despite both Victim and A.R.'s contrary testimony), then the presence of male DNA on the underwear is merely cumulative of other evidence that conclusively established male DNA was present on Victim's genitals. As for Defendant's second alternative, if the jury believed the underwear belonged to A.R., then the presence of male DNA on the underwear did not introduce any new information relevant to the charges against Defendant, who was not accused of any crime against A.R.

**{10}** In light of the foregoing, we conclude that the minor references to the underwear evidence, even if error, were harmless. Under the standard for nonconstitutional harmless error, the State has satisfied us that there is no reasonable probability that the underwear evidence affected the jury's verdict. *See Serna*, 2013-NMSC-033, ¶ 32.

## II. Prosecutorial Misconduct

### A. Closing Argument

**{11}** Defendant alleges the prosecutor committed misconduct during closing argument in two ways, neither of which is preserved. We review unpreserved claims of prosecutorial misconduct for fundamental error. *See State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348. When reviewing error in closing arguments, we consider "(1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense." *Id.* ¶ 26. "In applying these factors, the statements must be evaluated objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id.* "These three factors are useful guides, but in the final analysis context is paramount." *Id.* ¶ 34. "As with any fundamental error inquiry, we will upset a jury verdict only (1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Id.* ¶ 35; *see State v. Lensegrav*, 2025-NMSC-016, ¶ 28, 572 P.3d 924 ("Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." (internal quotation marks and citation omitted)).

### 1. Underwear Evidence

**{12}** Defendant argues that the prosecutor committed three separate instances of misconduct during closing argument when discussing the underwear evidence. The entirety of the prosecutor's remarks are as follows, and the italicized portions are the statements Defendant challenges on appeal:

[A.R.] testified that she believed those were her underwear, *that she maybe threw them away*, and that [she and Victim] also shared clothes. She also mentioned that she was not sexually active and that there is no reason that male DNA should be on those underwear. There is male DNA on that underwear. We've heard that from Jennifer Otto. Now, I'm not saying that those were [Victim's] underwear, but *those are the underwear [Victim] describes to the SANE nurses in the report.* Those are the only underwear they collected that matched that description. And there's male DNA on it. So, could [Victim] have been wearing them? Maybe. *Were they [A.R.'s]? Possibly. Maybe both. Maybe they were [A.R.'s] and she did wear them. . . . It really doesn't matter.* What matters is the DNA that was found on [Victim], because it's just male DNA. So, I'm not trying to argue to you all that those were the underwear [Victim was] wearing, but it doesn't make sense that she wasn't wearing them, especially if [A.R.] said there was no reason for any male DNA to be on those underwear because no male ever touched her underwear.

**{13}** First, Defendant contends the prosecutor mischaracterized A.R.'s testimony by saying that "[A.R.] testified that she believed those were her underwear, that she *maybe* threw them away." Defendant quibbles over the State's use of the qualifier "maybe." However, after reviewing A.R.'s trial testimony, we cannot agree that the State's argument was inaccurate. A.R. testified that the underwear was hers because "they had a hole in it and [her] period blood, so they had to be thrown away." A.R. did not state that *she* threw the underwear away herself; consequently, the State's qualification that A.R. was "maybe" the one who threw them in the trash was both a reasonable inference from and an accurate characterization of her testimony. *See State v. Montgomery*, 2017-NMCA-065, ¶ 13, 403 P.3d 707 ("It is misconduct for a prosecutor to make prejudicial statements not supported by evidence. However, statements having their basis in the evidence, together with reasonable inferences to be drawn therefrom, are permissible and do not warrant reversal." (alteration, internal quotation marks, and citation omitted)).

**{14}** Second, Defendant asserts that the prosecutor mischaracterized the underwear as matching Victim's description to the SANE nurse. The underwear introduced at trial were described as grey and black, and in the SANE report, Victim described her underwear as "dark bluish."[1] While it is debatable whether there is a material difference in these descriptions, Defendant has not advanced any argument as to why the State's characterization rises to the level of fundamental error, and absent a developed argument on the essential second step of the fundamental error analysis, we decline to reach the merits of this claim of error. *See State v. Ferguson*, 2023-NMCA-029, ¶ 30, 528 P.3d 707 (declining to reach the merits of a claim of fundamental error because the

---

[1] Defendant filed a motion to strike footnote 1 of the State's answer brief, which notes that the underwear is not part of the appellate record but offers a proffer about the color of the underwear and notes that this Court may designate the underwear as a supplemental exhibit on appeal. We deny Defendant's motion, but note that we have not considered the proffer made in footnote 1 in deciding this appeal to the extent it invites this Court to consider matters not in evidence.

defendant "ha[d] not developed an argument addressing the considerations relevant to a fundamental error analysis").

**{15}** Third, Defendant argues that the prosecutor improperly told the jury to consider the male DNA found on the underwear regardless of who wore the underwear, which raised the implication that Defendant had also sexually abused A.R. In context, we disagree with Defendant's characterization of the State's argument. The prosecutor did not tell the jury to consider the male DNA found on the underwear irrespective of who wore them; the prosecutor first indicated that it was possible that Victim had worn the underwear even if they belonged to A.R., and then told the jury that the *underwear evidence* "really doesn't matter" because "what matters is the DNA that was found on [*Victim*]." Therefore, we see no impropriety in the prosecutor's remarks.

**{16}** For all of these reasons, we find no error, fundamental or otherwise, in the prosecutor's remarks regarding the underwear evidence.

## 2. Speculation Comments

**{17}** Defendant also argues that the prosecutor committed misconduct during rebuttal closing argument. As Defendant acknowledges, defense counsel's closing "sought to highlight . . . missing evidence surrounding [Victim]'s disclosure to [her boyfriend]. He questioned why [Victim] and [her boyfriend]'s cell phones were not collected or preserved as evidence and argued that isolated messages disclosing the alleged assault presented the jury with a lack of context." According to Defendant, his counsel "suggested possible context that would explain some of the evidence at trial." The State responded during rebuttal closing by reminding the jury not to speculate, and the prosecutor's remarks are set forth in full for context:

> Defense is asking you to do exactly what the instructions that the judge gave you to not do. He's asking you to speculate on everything. That's what he's telling you to do when the law, what the judge gave you, tells you not to do. He wants you to speculate about things that weren't even brought into this courtroom during this week. That's their defense. Their defense is look at everything else because that's the only defense they have. They have to make you do something that is required that you not do, and that's to speculate. You don't get to speculate about text messages that weren't brought into this courtroom. You are not allowed to speculate about journals that weren't in this courtroom. You are not allowed to speculate about any evidence that did not come from this witness stand or that is not provided there in evidence. For them to even ask of you to not follow the instruction is to give up your oath.

A few minutes later, the State continued as follows:

> What is reasonable doubt? How it is all possible? Anything's possible, like when I could win the lottery tomorrow, right? What's possible. [Defense]

brought up this study and said that in that study, it talks about you can't date injuries or that you can date injuries, not date injuries I'm sorry, that they can come from consensual sex or not sex. Well, we don't have a history before you that says [Victim] had consensual sex. She said she's never had sex before. Never. There was no history given that anything else happened to her genitals besides what he did. So, to speculate on anything else is not holding up your oath and following the instructions that you all agreed to do.

**{18}** Defendant argues that the prosecutor's rebuttal closing (1) attacked defense counsel's ethical character by insinuating that counsel was encouraging the jury to violate its oath, (2) mischaracterized the burden of proof, and (3) misstated the law by directing the jury not to speculate.

**{19}** We summarily dispose of Defendant's first contention. Having reviewed the closing in full, though we agree with the State that the prosecutor's remarks were "inartful and inadvisable," we do not understand them to be a personal attack on defense counsel's character. *See State v. Torres*, 2012-NMSC-016, ¶ 9, 279 P.3d 740 (admonishing a prosecutor for referring "to information outside of evidence and his labeling of defense counsel as dishonest"); *Sosa*, 2009-NMSC-056, ¶ 24 ("[C]losing argument, and rebuttal argument in particular, is necessarily responsive and extemporaneous, not always capable of the precision that goes into prepared remarks.").

**{20}** As for Defendant's second contention, we are similarly unpersuaded that the prosecutor's rebuttal closing mischaracterized the burden of proof. Having reviewed the closing, we find no instance where the State appears to have suggested to the jury that the State did not carry the burden of proof, that the State did not have to prove the elements of the charged offenses beyond a reasonable doubt, or that Defendant was required to *disprove* the State's theory. We note as well that the jury was properly instructed on the State's burden, and "we presume that the jury followed the written instructions." *See State v. Armendarez*, 1992-NMSC-012, ¶ 13, 113 N.M. 335, 825 P.2d 1245 (holding that a prosecutor's isolated misstatement of the law in closing argument did not warrant reversal where the jury instructions contained a correct statement of the law). In sum, Defendant has not demonstrated that the prosecutor made an improper statement regarding the burden of proof.

**{21}** Finally, Defendant maintains that the State's rebuttal closing misstated the law. As we understand Defendant's argument on this point, he contends "[d]efense counsel merely highlighted the myriad of unanswered questions due to missing evidence," and because the jury may give weight to the absence of evidence, the jury's unanswered questions may give rise to reasonable doubt. Based on this premise, Defendant suggests that the State, by telling the jury not to speculate, functionally told the jury (1) it could not consider gaps in the evidence or consider evidence the State failed to collect or present, (2) "to consider only the State's version of events," (3) that "questioning [Victim]'s version of events" would be speculation, and "tantamount to not holding up

your oath," and (4) not to contemplate "the defense's proposed alternative scenarios." We do not agree with Defendant's characterization of either defense counsel's closing or the "functional" effect of the State's rebuttal.

**{22}** Defense counsel did more than "merely highlight" gaps in evidence. For example, defense counsel told the jury that it was not possible to determine the cause of Victim's injuries, and then suggested to the jury that "we don't know" if her injuries were caused by consensual sex with her boyfriend, nonconsensual sex, masturbation, or a foreign object. But Victim, who was only fourteen years old at the time of the assault, testified that she had never had a sexual encounter before the assault, and reported to the SANE that she had no history of consensual sex. In this way, defense counsel invited the jury to disregard multiple witnesses' testimony and speculate about alternative causes for Victim's injuries based on the specious theory that "gaps in the evidence," if filled in, might support a cause other than Defendant's conduct.

**{23}** Viewing the State's rebuttal argument with this context in mind, it is apparent that the State was encouraging the jury to rely on the evidence offered at trial and not to speculate about matters outside of the evidence. We see nothing to support Defendant's argument that the State suggested to the jury it could not consider gaps in evidence, that it could only consider the State's version of events, or that the jury could not question the credibility of Victim's account—the State, instead, correctly told the jury it should not speculate about the content of evidence not introduced, such as what text messages not in evidence might have shown. To the extent the State admonished the jury not to consider defense counsel's speculative alternative scenarios, such is consistent with the jury instructions given at trial. *See* UJI 14-6006 NMRA ("Your verdict should not be based on speculation, guess, or conjecture."); *see also State v. Montoya*, 2016-NMCA-098, ¶ 17, 384 P.3d 1114 ("Both the prosecutor and defense counsel are entitled to discuss reasonable doubt and to present his or her view of the evidence and to suggest whether the evidence supports reasonable doubt." (alteration, internal quotation marks, and citation omitted)).

**{24}** Finally, even if we were to conclude that some of the prosecutor's remarks about the oath crossed the line, we would nevertheless conclude the error does not "meet[] the threshold required to reverse a conviction." *Sosa*, 2009-NMSC-056, ¶ 26. Applying the *Sosa* factors, Defendant has not demonstrated that the prosecutor's statements invaded any constitutional protection. *See id.* The prosecutor's statements were isolated and brief; although the prosecutor commented twice that the jurors would be violating their oath were they to speculate regarding the absence of evidence, we cannot conclude that such remarks were "so pervasive as to clearly distort the body of evidence before the jury." *Id.* ¶ 38. *Cf. State v. Henderson*, 1983-NMCA-137, ¶ 7, 100 N.M. 519, 673 P.2d 144 (concluding that the prosecutor's lengthy retelling of another, unrelated sexual assault case was fundamental error). And finally, most of the prosecutor's remarks were invited by the defense's closing arguments. *See Sosa*, 2009-NMSC-056, ¶ 39 ("Having opened the door, [the d]efendant cannot now split semantic hairs over the prosecutor's choice of words.").

**{25}** For all these reasons, we conclude that the prosecutor's comments do not constitute fundamental error. *See id.* ¶ 35.

**B.    Cross-Examination**

**{26}** Defendant argues that the prosecutor committed misconduct during her cross-examination of A.R. by questioning the accuracy of a transcript used by defense counsel to refresh A.R.'s memory during direct examination. This claim of error was preserved, and our review is for abuse of discretion. *See State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728.

**{27}** A.R. was called to testify by the defense. During direct examination by defense counsel, A.R. responded to multiple questions by indicating that she could not remember details or events. Defense counsel refreshed A.R.'s recollection with a written transcript made from a video of A.R.'s Safehouse interview. On cross-examination, the prosecutor questioned A.R. about her memory and about the transcript used to refresh her memory:

| | |
|---|---|
| Prosecutor: | The transcript that [defense counsel] kept showing you, you don't really remember everything you've said in there, is that right? |
| A.R.: | That's right. |
| Prosecutor: | And actually, there's a video, right? |
| A.R.: | I think I remember her saying they were recording. |
| Prosecutor: | Okay, so there's a video and that transcript came from [defense counsel], correct? |
| A.R.: | Correct. |
| Prosecutor: | So you don't know if that transcription is actually saying the same thing that you said in the video, is that right? |
| Defense Counsel: | Objection, your honor. May we approach? |
| Court: | [I]t's a valid question. |
| Prosecutor: | You don't really have, like, an independent memory of everything you said? |
| A.R.: | Yeah, I don't. |

| Prosecutor: | And you don't have an independent memory of everything that happened that weekend. |
| A.R.: | Correct. |

**{28}**   The prosecutor concluded her cross-examination about a minute later. Before beginning any redirect, defense counsel moved the court to play the video of A.R.'s Safehouse interview. During the bench conference that followed, defense counsel asserted it was prosecutorial misconduct to allege that counsel would alter a transcript. The prosecutor responded by saying that the video was hard to hear, she had just received the transcript and had not had an opportunity to verify its accuracy, and A.R. could not remember what she had said during the interview. The district court denied defense counsel's request to play the video of A.R.'s Safehouse interview, but suggested the prosecutor should ask A.R. a few more questions to clarify that defense counsel did not alter the transcript. The prosecutor then engaged in the following exchange with A.R.:

| Prosecutor: | Just briefly, . . . you don't know who made that transcript, correct? |
| A.R.: | Correct. |
| Prosecutor: | And it wasn't [defense counsel] that did that transcript. It was somebody from Bean & Associates? |
| A.R.: | Correct. |
| Prosecutor: | Or that's what it says on there? |
| A.R.: | Yes. |
| Prosecutor: | So [defense counsel's] name's not on there? |
| A.R.: | I didn't see his name, so . . . |
| Prosecutor: | Okay. So it was somebody else that made that transcript. A transcriptionist. |
| A.R.: | Okay. |
| Prosecutor: | Okay. |

**{29}**   On appeal, Defendant argues that the prosecutor, improperly and without any basis, implied that the transcript of the Safehouse interview may be inaccurate by asking A.R., "So you don't know if that transcription is actually saying the same thing that you said in the video, is that right?" The State concedes that "the basis for questioning the accuracy of the transcript of A[.R.]'s Safehouse interview was lacking." Nevertheless, in context, the prosecutor's question was part of a series of questions

directed at A.R.'s lack of independent memory, which is a permissible subject of inquiry on cross-examination. *See State v. Montoya*, 2014-NMSC-032, ¶ 39, 333 P.3d 935 ("Cross-examination serves to test the completeness as well as the accuracy of testimony."); *State v. Bent*, 2013-NMCA-108, ¶ 10, 328 P.3d 677 (stating that a witness's credibility can be tested by questioning the witness's "powers of discernment, memory, and description" (internal quotation marks and citation omitted)). This is particularly so in light of A.R.'s responses on direct examination. After A.R. testified that she did not remember what she said in the Safehouse interview, defense counsel sought to refresh her recollection with the transcript of the interview. When asked by the district court whether the transcript refreshed her recollection, A.R. stated that the transcript "tells me what I said," but did not help her to recall details from the weekend of the assault enough to testify before the court. After this exchange and a bench conference, defense counsel had A.R. read portions of the transcript aloud to the jury. *See* Rule 11-803(5) NMRA (allowing a recorded recollection to be read into the record under certain circumstances). In light of all of this, we cannot say the district court erred in concluding the prosecutor's brief question, which established nothing more than that A.R. had no independent memory of what she had previously said during her interview and could not confirm the accuracy of the transcript, was a valid question.

**{30}** Moreover, Defendant has not persuaded us that the district court's remedy was inadequate. During trial, Defendant objected and argued that the prosecutor had engaged in misconduct by suggesting that defense counsel had altered the transcript. On appeal, Defendant claims that the prosecutor "emphasized that the transcripts came from defense counsel, constituting a veiled attack on his credibility." With respect to both arguments, the district court's remedy—allowing the prosecutor to ask additional questions—clarified that the transcript did not come from defense counsel, but rather, had been prepared by a transcriptionist from Bean & Associates. This was sufficient to cure the particular prejudice Defendant identified. We likewise reject Defendant's contention that here, too, the prosecutor's remarks amounted to an attack on defense counsel's credibility. As discussed above, the prosecutor's questions were directed at A.R.'s lack of memory, not defense counsel's conduct. And finally, because we have concluded that the district court's remedy was adequate, we conclude the district court did not abuse its discretion in denying Defendant's request to play the video of A.R.'s Safehouse interview to corroborate the accuracy of the transcript.

**{31}** For all of the foregoing reasons, we conclude there was no error in the prosecutor's questioning about the transcript or the district court's handling of the matter.

## III.   Cumulative Error

**{32}** As a final matter, Defendant argues that cumulative errors affected the verdict and deprived him of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Arguello*, 2024-NMCA-074, ¶ 14, 557 P.3d 1018 (internal quotation marks and citation omitted).

However, where "the record as a whole demonstrates that a defendant received a fair trial," we will not apply the doctrine of cumulative error. *State v. Garvin*, 2005-NMCA-107, ¶ 14, 138 N.M. 164, 117 P.3d 970 (internal quotation marks and citation omitted). Because we have determined that the only potential error in this case—the admission of the underwear evidence and the DNA collected from it—was harmless error, we reject Defendant's cumulative error argument. *See State v. Carrillo*, 2017-NMSC-023, ¶ 53, 399 P.3d 367 ("Because we find only one error at trial, an error which was harmless, we reject [the d]efendant's cumulative error claim."); *see also Allen*, 2000-NMSC-002, ¶ 117 ("[A] fair trial is not necessarily a perfect trial.").

**CONCLUSION**

**{33}** We affirm.

**{34}  IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JANE B. YOHALEM, Judge**